Leiv Blad (Cal. Bar No. 151353)
leiv@competitionlawpartners.com
Jeffrey Blumenfeld (Admitted *pro hac vice*)
jeff@competitionlawpartners.com
Meg Slachetka (Admitted *pro hac vice*)
meg@competitionlawpartners.com
**COMPETITION LAW PARTNERS PLLC**
1101 Pennsylvania Ave., NW
Washington, DC 20004
Telephone: (202) 742-4300
Facsimile: (202) 810-9815

Don Bivens (Admitted *pro hac vice*)
don@donbivens.com
Teresita T. Mercado (Admitted *pro hac vice*)
teresita@donbivens.com
**DON BIVENS PLLC**
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
Telephone: (602) 708-1450

*Attorneys for Plaintiffs*
*Additional Counsel on Signature Page*

**UNITED STATES DISTRICT COURT**
**FOR THE CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| DANIEL FRANK, LAKSHMI NAGIREDDI, ERIC YECKLEY, SHERRIE MILES, and HEATHER YASHAR,<br><br>on behalf of themselves and all others similarly situated,<br><br>                    Plaintiffs,<br><br>    vs. | Case No.: 8:24-cv-00617-JVS(KESx)<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

- 1 -

YARDI SYSTEMS, INC., GREYSTAR
REAL ESTATE PARTNERS, LLC,
LINCOLN PROPERTY COMPANY,
ASSET LIVING, FPI MANAGEMENT,
RPM LIVING, AVENUE5
RESIDENTIAL, 10 FEDERAL
COMPANIES, BALACIANO GROUP,
RAM PARTNERS, LLC, ESSEX
PROPERTY TRUST, INC., WESTERN
NATIONAL PROPERTY
MANAGEMENT, CONTINENTAL
REALTY CORP., WALTON
COMMUNITIES, AND A.J.
DWOSKIN & ASSOCIATES,

Defendants.

# I.    INTRODUCTION

1.    Plaintiffs Daniel Frank, Lakshmi Nagireddi, Eric Yeckley, Sherrie Miles, and Heather Yashar bring this action against Yardi Systems, Inc. ("Yardi"), Greystar Real Estate Partners, LLC ("Greystar"), Lincoln Property Company ("Lincoln"), Asset Living, FPI Management ("FPI"), RPM Living ("RPM"), Avenue5 Residential ("Avenue5"), 10 Federal Companies ("10 Federal"), Balaciano Group ("Balaciano"), RAM Partners, LLC ("RAM Partners"), Essex Property Trust, Inc. ("Essex"), Western National Property Management ("WNPM"), Continental Realty Corp. ("CRC"), Walton Communities ("Walton"), and A.J. Dwoskin & Associates ("Dwoskin"), (collectively, "Defendants"), under Section 1 of the Sherman Act on behalf of themselves and all others similarly situated.

2.    Yardi develops property management software for landlords and managers (collectively, "Property Managers") of Mid-Range and High-End multifamily real estate units ("Apartments"), as Yardi defines those terms. Defendants other than Yardi are Property Managers of Apartments.

FIRST AMENDED COMPLAINT

3.      The Defendants have conspired to fix the prices of Apartment leases across the nation, which has artificially raised the prices tenants must pay for living space. This is true even when the quality of service the Property Managers offer has decreased. Indeed, Property Managers have raised or maintained Plaintiffs' lease prices as (i) security staff has decreased; (ii) maintenance staff has decreased; (iii) management staff has been moved from individual apartment buildings to a central location from which it has become more difficult and time-consuming to obtain assistance to address property-specific issues; (iv) wait times for maintenance and other services, such as removal of graffiti, have increased; and (v) crime has made living conditions so unsafe that tenants fear leaving their apartments at certain times of the day.

4.      Yet, the Defendant Property Managers have maintained or increased lease prices for Plaintiffs and remain vigilant in sending threatening emails to Plaintiffs demanding rent payments by the end of the first day on which payments must be made.

5.      This perverse situation has arisen because Yardi has for more than a decade marketed its platform services based on a public guarantee that Property Managers using the platform join a horizontal conspiracy enabling them to charge their tenants at least 6% above market rates and above the level the Property Managers would have charged had they set prices unilaterally. This Complaint seeks to end that unlawful conspiracy and restore competition to the residential rental market.

6.      Using its property management software and its aptly named "RENTmaximizer" service,[1] Yardi provides a platform enabling price fixing among

---

[1] Perhaps realizing that the name revealed too much, Yardi later changed the name of the service to "Revenue IQ." This Complaint uses "RENTmaximizer" to

FIRST AMENDED COMPLAINT

the Property Managers in apartment markets across the country. Yardi's collusive system comprises three distinct elements: (a) the Property Managers agree with Yardi to convey their competitively sensitive pricing data to Yardi; (b) the Property Managers agree to empower Yardi to use their data to manage the rental pricing for each Property Manager in a particular market; and (c) the Property Managers agree not to compete with each other on price.

7. In the first element of the unlawful agreement, the Property Managers give to Yardi granular detail about their rental units. For each one of their apartment units, this data includes the square footage, floor plan, amenities, availability, vacant days, lease term, price, discounts, and notice premium. These are not merely episodic estimations of the Property Managers' rack rates, but real-time data on every detail of each of their apartment units, including price and discounts.

8. As part of the first element of the unlawful agreement, the Property Managers agree to obtain and provide to Yardi data about their competitors' apartment units that is similar to the data regarding the Property Managers' own units. As the Property Managers know, Yardi uses the competitors' data in managing the pricing of the Property Managers' leases. Yardi makes this explicit: it builds into RENTmaximizer so-called "surveys" of the Property Managers' competitors' unit details, including pricing data, urging the Property Managers that "to stay competitive in the market you must have a thorough understanding of what your Competitors are offering."

9. And whether the price data the Property Managers collect from their competitors is public or fastidiously protected as private makes no difference to the legality of the conduct. What matters is that the Defendants collusively agree to obtain the data for the purposes of empowering Yardi to manage the Property

_____

denominate the Yardi service and software at issue whether it was named RENTmaximizer or Revenue IQ at the time.

Managers' Apartment lease pricing and collectively use the data as metrics on which Yardi does so.

10.    In the second element of the unlawful agreement, the Property Managers agree to let Yardi manage their pricing. With now-perfect knowledge of each particular market, Yardi removes the uncertainty about other Property Managers' pricing decisions that in a competitive market would force Property Managers acting unilaterally to lower prices to obtain a tenant's business. Property Managers instead know that Yardi coordinates pricing of all Property Managers in the relevant market. Yardi makes its collusive pricing a known feature of its service: "You manage your business, we manage your pricing."

11.    Yardi offers Property Managers pricing "recommendations," which are not idle speculation, but specific rates Yardi calculates are achievable based on its analysis of the Property Managers' and their competitors' data.

12.    Yardi has admitted that it coordinates the Property Managers' pricing. It proclaims that RENTmaximizer—not each Property Manager individually and unilaterally—"prices new and renewal leases using the balance between real-time inventory, traffic and market conditions."

13.    The result is predictable: with one entity managing pricing based on perfect knowledge instead of many Property Managers competing against each other armed only with imperfect knowledge, rental prices have increased and discounting has all but disappeared. Indeed, Property Managers boast that once they are a part of the price-fixing scheme they need not worry about discounts or concessions to win tenants. As one Property Manager put it, Yardi "simplifies the process by eliminating rent rate guesswork and traditional sales devices such as concessions and specials;"[2] in other words, Yardi simplifies the process by eliminating the need to compete.

---

[2] https://www.businesswire.com/news/home/20160621005024/en/Rockbridge-Group-Increases-Rent-Revenue-Yardi-RENTmaximizer.

FIRST AMENDED COMPLAINT

14.    Yardi works hard to provide the Property Managers with ongoing data to explain why its recommendations are achievable. For example, Yardi promises Property Managers that it will provide improved visibility into the market, including "**daily** management reports [that] help [Property Managers] understand pricing changes" (emphasis added).

15.    Yardi boasts that its managed pricing is so sensitive to current price movements in a particular market, meaning so sensitive to accurate real-time information, that its pricing recommendations are "only valid for the current day (until midnight) not twenty-four (24) hours."

16.    This is the key feature of Yardi's price-fixing scheme: instead of each Property Manager competing for tenants by setting its own rental rates, a single entity—Yardi—manages rates for all its Property Manager customers. This price coordination is antithetical to a competitive market, and illegal.

17.    The salient point is not whether each Property Manager charges the exact rental price Yardi recommends. Rather, the salient point is that Yardi manages the pricing that the Property Managers impose on their tenants. Whether the Property Managers use the price recommendation they receive from Yardi as the exact rental price they charge, as a data-backed promise that they can charge rental prices in that range, or as the starting point of a negotiation, the effect is the same: the Yardi-powered price coordination is a *per se* violation of Section 1 of the Sherman Act.

18.    The third element of the unlawful agreement is that by signing on with Yardi, providing their competitively sensitive data, and—finally—imposing on tenants the Yardi-managed lease prices, the Property Managers execute on their promise that they will not compete against each other on price. Instead, Property Managers can rely on Yardi's system to impose "pricing discipline" on all its Property Managers. As one Property Manager put it, "RENTmaximizer has taken the guesswork out of our rental pricing and lease terms, and boosts pricing

FIRST AMENDED COMPLAINT

performance through an intelligent system of measurements, fixed factors and discipline."[3]

19.    Yardi admits not only the means by which it enables price fixing but also the results, namely that its collusive system increases the prices Property Managers charge their tenants by at least 6% above the market level and above the level the Property Managers would have charged had they set prices unilaterally.

20.    The only alternative means to accomplish the same result[4] would be for all the participating Property Managers to systematically exchange prices among themselves and agree on the exact or approximate prices they will charge. That would be *per se* illegal. And the Yardi price-fixing platform is equally *per se* illegal, as Yardi admits that its system enables Property Managers to increase price above market rates.

21.    Defendants' own trade associations acknowledge that arrangements like this are unlawful. The landlord trade association, of which a number of Defendants are members, acknowledges that Property Managers may not lawfully exchange information regarding price, including the components of lease pricing: "Competitors should not discuss sensitive competitive matters, including but not limited to prices, bids, [and] quotes…."[5]

22.    The National Association of Residential Property Managers, a trade association for property managers of single-family and small residential properties, prohibits its members from discussing pricing in the way that Yardi facilitates: "The

_____

[3] https://www.businesswire.com/news/home/20150217005101/en/HNN-Associates-LLC-Optimizes-Rental-Pricing-Performance-with-Yardi-RENTmaximizer.

[4] There is one other alternative: all the Property Managers could merge becoming a single Property Manager for all rental properties in the United States or in a particular Apartment Market. And while there is, at least for now, no category of *per se* illegal mergers, there can be no doubt that such a merger would be unlawful.

[5] https://www.naahq.org/naa-antitrust-compliance-statement.

FIRST AMENDED COMPLAINT

Antitrust Laws prohibit … any joint conduct among competitors that could lessen competition in the marketplace. NARPM®'s membership is composed of competitors; they must refrain from discussing competitively sensitive topics, including those relating to pricing (such as rates, fees, or costs)…."

23.    In addition, San Francisco's Board of Supervisors voted unanimously to ban software "programs that enable landlords to indirectly coordinate with one another through the sharing of nonpublic competitively sensitive data … to artificially inflate rents and vacancy rates for rental housing." A final vote by the Board will occur on September 3, 2024.

24.    Yet that is precisely what Yardi empowers the Property Managers to do. The result of Yardi's illegal enablement of Property Manager price fixing is a windfall for the Defendants and artificially higher prices for individuals and families in cities and suburbs across this country that lease Apartments from Property Managers. Yardi's conduct is illegal not because Yardi allegedly employs an algorithmic pricing tool. Whether Yardi uses an algorithm or an abacus to calculate its "recommended" lease prices is immaterial. The conduct is illegal because the Yardi services are a platform upon which the Property Managers engage in a horizonal *per se* price fix. This suppresses the price competition that would benefit renters and raises rental prices in each market.

25.    The allegations in this First Amended Complaint are taken from Yardi's and the Property Managers' own statements about the RENTmaximizer service. Each factual allegation quotes from and cites to a specific document in which Yardi or a Property Manager made those statements. Thus, each factual allegation in this First Amended Complaint is based on a binding admission by a Yardi employee or agent or by a Property Manager.

26.    Plaintiffs seek to end Yardi's unlawful price-fixing conspiracy and to restore competition to Apartment Markets throughout this country by this action for treble damages and injunctive relief.[6] Plaintiffs demand a jury trial.[7]

## II.    THE PARTIES

27.    Plaintiff Daniel Frank is a resident of Peachtree Corners, Georgia. He rents an apartment from Defendant RAM Partners, and Defendants' conduct has caused him to pay higher lease prices for his living space.

28.    Plaintiff Lakshmi Narigeddi is a resident of Oakland, California. He rents an apartment from Defendant Greystar, and Defendants' conduct has caused him to pay higher lease prices for his living space.

29.    Plaintiff Eric Yeckley is a resident of Los Angeles, California. He rents an apartment from Defendant Essex, and Defendants' conduct has caused him to pay higher lease prices for his living space.

---

[6] The term "Apartment Market" is further defined in paragraphs 103-113, *infra*.

[7] This is the third federal action against Property Managers and their pricing coordination. Pending in the United States District Court for the Middle District of Tennessee is multi-district litigation against RealPage, Inc. and a different group of property owners and managers. Yardi is not a party in that litigation, which is in discovery following a partial denial of a Rule 12(b)(6) motion to dismiss. The second action is against Yardi and a group of property owners and managers pending in the United States District Court for the Western District of Washington. That action differs from this one in that this action names different Defendants, defines different markets, and does not allege that it is the Defendants' use of algorithmic pricing that violates Section 1 of the Sherman Act. This action alleges that the unlawful price fixing results from an agreement not to compete among, and the sharing of competitively-sensitive data by, the Property Managers that Yardi then uses to set the rental prices for Property Managers well above those that would exist in a competitive market and which the Property Managers then impose on their tenants either exactly or approximately.

FIRST AMENDED COMPLAINT

30.     Plaintiff Sherrie Miles is a resident of Hercules, California. She rents an apartment that until recently was managed by Defendant Greystar, and Defendants' conduct has caused her to pay higher lease prices for her living space.

31.     Plaintiff Heather Yashar is a resident of San Francisco, California. She rents an apartment from Defendant Essex, and Defendants' conduct has caused her to pay higher lease prices for her living space.

32.     Yardi is a California corporation headquartered in Goleta, California. Yardi licenses and supplies property management software and services to owners and managers of multifamily residential units.

33.     Greystar is headquartered in Charleston, South Carolina. Greystar provides apartment management services and is a client of Yardi. Greystar is the largest Property Manager in the United States. Greystar has entered into a contract with Yardi by which it joined with other Yardi client Property Managers to collude on lease pricing by outsourcing their pricing decisions to Yardi rather than setting lease prices independently and in competition with each other. Pursuant to that contract and in its role as a member of the Property Manager cartel Greystar has provided to Yardi its competitively sensitive information and the information of other Property Managers in Apartment Markets in the United States, including, but not limited to, unit prices, lease terms, discounts, and vacancy days. Greystar has done so knowing that Yardi would use that data to set lease prices for Greystar and its competitors in Apartment Markets in which Greystar operates. By providing this data to Yardi and outsourcing pricing decisions to Yardi, Greystar has reduced competition in Apartment Markets and thereby imposed supracompetitive prices on members of the class.

34.     Lincoln is headquartered in Dallas, Texas. Lincoln provides apartment management services and is a client of Yardi. Lincoln is the second largest Property Manager in the United States. Lincoln has entered into a contract with Yardi by

FIRST AMENDED COMPLAINT

1    which it joined with other Yardi client Property Managers to collude on lease pricing
2    by outsourcing their pricing decisions to Yardi rather than setting lease prices
3    independently and in competition with each other. Pursuant to that contract and in
4    its role as a member of the Property Manager cartel Lincoln has provided to Yardi
5    its competitively sensitive information and the information of other Property
6    Managers in Apartment Markets in the United States, including, but not limited to,
7    unit prices, lease terms, discounts, and vacancy days. Lincoln has done so knowing
8    that Yardi would use that data to set lease prices for Lincoln and its competitors in
9    Apartment Markets in which Lincoln operates. By providing this data to Yardi and
10   outsourcing pricing decisions to Yardi, Lincoln has reduced competition in
11   Apartment Markets and thereby imposed supracompetitive prices on members of the
12   class.

13          35.    Asset Living is headquartered in Houston, Texas. Asset Living
14   provides apartment management services and is a client of Yardi. Asset Living is the
15   third largest Property Manager in the United States. Asset Living has entered into a
16   contract with Yardi by which it joined with other Yardi client Property Managers to
17   collude on lease pricing by outsourcing their pricing decisions to Yardi rather than
18   setting lease prices independently and in competition with each other. Pursuant to
19   that contract and in its role as a member of the Property Manager cartel Asset Living
20   has provided to Yardi its competitively sensitive information and the information of
21   other Property Managers in Apartment Markets in the United States, including, but
22   not limited to, unit prices, lease terms, discounts, and vacancy days. Asset Living
23   has done so knowing that Yardi would use that data to set lease prices for Asset
24   Living and its competitors in Apartment Markets in which Asset Living operates.
25   By providing this data to Yardi and outsourcing pricing decisions to Yardi, Asset
26   Living has reduced competition in Apartment Markets and thereby imposed
27   supracompetitive prices on members of the class.

28

FIRST AMENDED COMPLAINT

36.    FPI is headquartered in Folsom, California. FPI provides apartment management services and is a client of Yardi. FPI is the fifth largest Property Manager in the United States. FPI has entered into a contract with Yardi by which it joined with other Yardi client Property Managers to collude on lease pricing by outsourcing their pricing decisions to Yardi rather than setting lease prices independently and in competition with each other. Pursuant to that contract and in its role as a member of the Property Manager cartel FPI has provided to Yardi its competitively sensitive information and the information of other Property Managers in Apartment Markets in the United States, including, but not limited to, unit prices, lease terms, discounts, and vacancy days. FPI has done so knowing that Yardi would use that data to set lease prices for FPI and its competitors in Apartment Markets in which FPI operates. By providing this data to Yardi and outsourcing pricing decisions to Yardi, FPI has reduced competition in Apartment Markets and thereby imposed supracompetitive prices on members of the class.

37.    RPM is headquartered in Austin, Texas. RPM provides apartment management services and is a client of Yardi. RPM is the sixth largest Property Manager in the United States. RPM has entered into a contract with Yardi by which it joined with other Yardi client Property Managers to collude on lease pricing by outsourcing their pricing decisions to Yardi rather than setting lease prices independently and in competition with each other. Pursuant to that contract and in its role as a member of the Property Manager cartel RPM has provided to Yardi its competitively sensitive information and the information of other Property Managers in Apartment Markets in the United States, including, but not limited to, unit prices, lease terms, discounts, and vacancy days. RPM has done so knowing that Yardi would use that data to set lease prices for RPM and its competitors in Apartment Markets in which RPM operates. By providing this data to Yardi and outsourcing

FIRST AMENDED COMPLAINT

pricing decisions to Yardi, RPM has reduced competition in Apartment Markets and thereby imposed supracompetitive prices on members of the class.

38.     Avenue5 is headquartered in Seattle, Washington. Avenue5 provides apartment management services and is a client of Yardi. Avenue5 is the tenth largest Property Manager in the United States. Avenue5 has entered into a contract with Yardi by which it joined with other Yardi client Property Managers to collude on lease pricing by outsourcing their pricing decisions to Yardi rather than setting lease prices independently and in competition with each other. Pursuant to that contract and in its role as a member of the Property Manager cartel Avenue5 has provided to Yardi its competitively sensitive information and the information of other Property Managers in Apartment Markets in the United States, including, but not limited to, unit prices, lease terms, discounts, and vacancy days. Avenue5 has done so knowing that Yardi would use that data to set lease prices for Avenue5 and its competitors in Apartment Markets in which Avenue5 operates. By providing this data to Yardi and outsourcing pricing decisions to Yardi, Avenue5 has reduced competition in Apartment Markets and thereby imposed supracompetitive prices on members of the class.

39.     10 Federal is headquartered in Raleigh, North Carolina. 10 Federal has provided apartment management services and has been a client of Yardi. 10 Federal entered into a contract with Yardi by which it joined with other Yardi client Property Managers to collude on lease pricing by outsourcing their pricing decisions to Yardi rather than setting lease prices independently and in competition with each other. Pursuant to that contract and in its role as a member of the Property Manager cartel 10 Federal provided to Yardi its competitively sensitive information and the information of other Property Managers in Apartment Markets in the United States, including, but not limited to, unit prices, lease terms, discounts, and vacancy days. 10 Federal did so knowing that Yardi would use that data to set lease prices for

FIRST AMENDED COMPLAINT

Balaciano and its competitors in Apartment Markets in which 10 Federal operated. By providing this data to Yardi and outsourcing pricing decisions to Yardi, 10 Federal reduced competition in Apartment Markets and thereby imposed supracompetitive prices on members of the class.

40.    Balaciano is headquartered in Los Angeles, California. Balaciano provides apartment management services and is a client of Yardi. Balaciano has entered into a contract with Yardi by which it joined with other Yardi client Property Managers to collude on lease pricing by outsourcing their pricing decisions to Yardi rather than setting lease prices independently and in competition with each other. Pursuant to that contract and in its role as a member of the Property Manager cartel Balaciano has provided to Yardi its competitively sensitive information and the information of other Property Managers in Apartment Markets in the United States, including, but not limited to, unit prices, lease terms, discounts, and vacancy days. Balaciano has done so knowing that Yardi would use that data to set lease prices for Balaciano and its competitors in Apartment Markets in which Balaciano operates. By providing this data to Yardi and outsourcing pricing decisions to Yardi, Balaciano has reduced competition in Apartment Markets and thereby imposed supracompetitive prices on members of the class.

41.    RAM Partners is headquartered in Atlanta, Georgia. RAM Partners provides apartment management services and is a client of Yardi. RAM Partners has entered into a contract with Yardi by which it joined with other Yardi client Property Managers to collude on lease pricing by outsourcing their pricing decisions to Yardi rather than setting lease prices independently and in competition with each other. Pursuant to that contract and in its role as a member of the Property Manager cartel RAM Partners has provided to Yardi its competitively sensitive information and the information of other Property Managers in Apartment Markets in the United States, including, but not limited to, unit prices, lease terms, discounts, and vacancy days.

FIRST AMENDED COMPLAINT

RAM Partners has done so knowing that Yardi would use that data to set lease prices for RAM Partners and its competitors in Apartment Markets in which RAM Partners operates. By providing this data to Yardi and outsourcing pricing decisions to Yardi, RAM Partners has reduced competition in Apartment Markets and thereby imposed supracompetitive prices on members of the class.

42.     Essex is headquartered in San Mateo, California. Essex provides apartment management services and is a client of Yardi. Essex has entered into a contract with Yardi by which it joined with other Yardi client Property Managers to collude on lease pricing by outsourcing their pricing decisions to Yardi rather than setting lease prices independently and in competition with each other. Pursuant to that contract and in its role as a member of the Property Manager cartel Essex has provided to Yardi its competitively sensitive information and the information of other Property Managers in Apartment Markets in the United States, including, but not limited to, unit prices, lease terms, discounts, and vacancy days. Essex has done so knowing that Yardi would use that data to set lease prices for Essex and its competitors in Apartment Markets in which Essex operates. By providing this data to Yardi and outsourcing pricing decisions to Yardi, Essex has reduced competition in Apartment Markets and thereby imposed supracompetitive prices on members of the class.

43.     WNPM is headquartered in Irvine, California. WNPM provides apartment management services and is a client of Yardi. WNPM has entered into a contract with Yardi by which it joined with other Yardi client Property Managers to collude on lease pricing by outsourcing their pricing decisions to Yardi rather than setting lease prices independently and in competition with each other. Pursuant to that contract and in its role as a member of the Property Manager cartel WNPM has provided to Yardi its competitively sensitive information and the information of other Property Managers in Apartment Markets in the United States, including, but

FIRST AMENDED COMPLAINT

1 not limited to, unit prices, lease terms, discounts, and vacancy days. WNPM has
2 done so knowing that Yardi would use that data to set lease prices for WNPM and
3 its competitors in Apartment Markets in which WNPM operates. By providing this
4 data to Yardi and outsourcing pricing decisions to Yardi, WNPM has reduced
5 competition in Apartment Markets and thereby imposed supracompetitive prices on
6 members of the class.

7     44.    CRC is headquartered in Baltimore, Maryland. CRC provides
8 apartment management services and is a client of Yardi. CRC has entered into a
9 contract with Yardi by which it joined with other Yardi client Property Managers to
10 collude on lease pricing by outsourcing their pricing decisions to Yardi rather than
11 setting lease prices independently and in competition with each other. Pursuant to
12 that contract and in its role as a member of the Property Manager cartel CRC has
13 provided to Yardi its competitively sensitive information and the information of
14 other Property Managers in Apartment Markets in the United States, including, but
15 not limited to, unit prices, lease terms, discounts, and vacancy days. CRC has done
16 so knowing that Yardi would use that data to set lease prices for CRC and its
17 competitors in Apartment Markets in which CRC operates. By providing this data
18 to Yardi and outsourcing pricing decisions to Yardi, CRC has reduced competition
19 in Apartment Markets and thereby imposed supracompetitive prices on members of
20 the class.

21     45.    Walton is headquartered in Atlanta, Georgia. Walton provides
22 apartment management services and is a client of Yardi. Walton has entered into a
23 contract with Yardi by which it joined with other Yardi client Property Managers to
24 collude on lease pricing by outsourcing their pricing decisions to Yardi rather than
25 setting lease prices independently and in competition with each other. Pursuant to
26 that contract and in its role as a member of the Property Manager cartel Walton has
27 provided to Yardi its competitively sensitive information and the information of

28

FIRST AMENDED COMPLAINT

other Property Managers in Apartment Markets in the United States, including, but not limited to, unit prices, lease terms, discounts, and vacancy days. Walton has done so knowing that Yardi would use that data to set lease prices for Walton and its competitors in Apartment Markets in which Walton operates. By providing this data to Yardi and outsourcing pricing decisions to Yardi, Walton has reduced competition in Apartment Markets and thereby imposed supracompetitive prices on members of the class.

46.    Dwoskin is headquartered in Fairfax, Virginia. Dwoskin provides apartment management services and is a client of Yardi. Dwoskin has entered into a contract with Yardi by which it joined with other Yardi client Property Managers to collude on lease pricing by outsourcing their pricing decisions to Yardi rather than setting lease prices independently and in competition with each other. Pursuant to that contract and in its role as a member of the Property Manager cartel Dwoskin has provided to Yardi its competitively sensitive information and the information of other Property Managers in Apartment Markets in the United States, including, but not limited to, unit prices, lease terms, discounts, and vacancy days. Dwoskin has done so knowing that Yardi would use that data to set lease prices for Dwoskin and its competitors in Apartment Markets in which Dwoskin operates. By providing this data to Yardi and outsourcing pricing decisions to Yardi, Dwoskin has reduced competition in Apartment Markets and thereby imposed supracompetitive prices on members of the class.

47.    Other persons, firms, and corporations not named as Defendants have participated as co-conspirators with Defendants and have performed acts in furtherance of the conspiracy.

FIRST AMENDED COMPLAINT

## III.    JURISDICTION AND VENUE

48.    This Court has subject matter jurisdiction of these claims under 28 U.S.C. §§ 1331 and 1337 and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

49.    This Court has personal jurisdiction over the Defendants under Section 12 of the Clayton Act, 15 U.S.C. § 22.

50.    Defendants' conduct was within the flow of and was intended to and did have a direct and substantial effect on the interstate commerce of the United States, including in this District.

51.    Venue is proper in this District pursuant to 28 U.S.C. § 1391 and Section 12 of the Clayton Act, 15 U.S.C. § 22, because Yardi is headquartered in this District, a substantial part of the alleged events giving rise to the claims occurred, and a substantial portion of the affected interstate trade and commerce described below was carried out, in this District.

## IV.    YARDI'S DEVELOPMENT OF RENTMAXIMIZER

52.    In a competitive Apartment Market, each Property Manager sets its own rental terms and competes for renters based on price, among other factors. To compete on price each Property Manager offers a combination of various price-related terms including the stated monthly rental price, up-front discounts, and length-of-lease discounts, among other incentives and lease elements.

53.    Each Property Manager in a competitive market has only imperfect knowledge about its competitors' operational details, including their rental prices. This uncertainty means that each Property Manager prices its units with the fear that its prices may be too high to attract tenants compared to its competitors' prices. The result is lower prices as competing Property Managers vie for tenants.

54.    That uncertainty-based model is the key to competition and it is how Apartment Markets operated prior to Yardi's strategy to enable collusive pricing

FIRST AMENDED COMPLAINT

among Property Managers. Before Yardi, the barriers to Property Manager collusion were formidable: Apartment Markets are local, not national, and demand for Apartments within local markets depends on several factors, including price, location, size, layout, etc.

55. Prior to Yardi, property Managers did not have the scale to organize a nationwide price-fixing conspiracy that would raise prices in each Apartment Market. They generally did not operate in every Apartment Market, and they knew that raising price in any one market risked price competition from Property Managers in that Apartment Market as well as in adjacent Apartment Markets. And even in a particular Apartment Market the logistical challenges were formidable: Property Managers would have had to exchange extremely detailed information on each of their units in each of their properties on a daily basis, which would have been nearly impossible as a practical matter as well as dangerously and explicitly illegal.

56. Yardi has the structure and the scale to do what the Property Managers could not do themselves—empower a nationwide conspiracy fixing prices in each Apartment Market. Yardi is a national company delivering management software to Property Managers throughout the country who essentially outsource to Yardi many of the back-office services the Property Managers historically had performed themselves. It did not take much imagination for Yardi to transform that business into a national platform for price fixing among Property Managers.

57. Beginning in 2011, Yardi expanded its services to include "RENTmaximizer," a software package it advertises as a "transparent revenue management system." Using RENTmaximizer, Property Managers give their competitively sensitive information to Yardi, including, but not limited to, unit prices, lease terms, discounts, and vacancy days. Yardi then uses that information to organize market-wide lease pricing that eliminates price competition and maximizes the Property Managers' revenues. Yardi thus transforms each Property Manager's

FIRST AMENDED COMPLAINT

1  "imperfect" knowledge of its competitors' pricing into literally "perfect" knowledge

2  that Yardi uses to set prices.

3      58.    RENTmaximizer has three components.

4      59.    *First*, Yardi's agreements require the Property Managers to provide

5  Yardi with their competitively sensitive information on a granular level about each

6  of their Apartment units including rental prices, unit type, and current occupancy

7  status. In addition, the Property Managers complete "surveys" in RENTmaximizer

8  providing the same granular detail about their competitors' Apartments. The

9  Property Managers do this knowing that Yardi will use their and their competitors'

10  data in pricing the Property Managers' Apartment leases. Thus, Yardi directs the

11  gathering of the competitors' data and the Property Managers gather that data for the

12  express purpose of fixing the prices of the Property Managers' Apartment leases,

13  providing a metric by which Yardi prices those leases.

14      60.    *Second*, each Property Manager agrees to allow Yardi to manage the

15  prices for the Property Manager's Apartment leases. Instead of each Property

16  Manager setting price unilaterally, each Property Manager agrees to let Yardi

17  manage its pricing. The result is collusive pricing based on perfect information about

18  Yardi's clients' and their competitors' offerings, and the collusive setting of prices

19  far above the prices that the Property Managers—armed with only imperfect

20  information—would charge in the same market unilaterally. This is the explicit

21  Yardi guarantee: each Property Manager knows that its leases—and leases of the

22  other Yard-client Property Managers in the same Apartment Market with which it

23  no longer competes thanks to Yardi—are priced higher than the rates the Property

24  Managers would have set had they priced the leases unilaterally in a competitive

25  market.[8]

26

27

28  _____

[8]  Whether the Property Managers accept the Yardi price as the exact rental price
they charge, as a data-backed promise that they can charge rental prices in that range,

61.    *Third*, by outsourcing their pricing decisions to a single entity—agreeing to allow Yardi to price their leases—each Property Manager agrees with the other Property Managers not to compete based on price. Indeed, the Property Managers happily have proclaimed that Yardi's pricing has taken the uncertainty and guesswork—as the Property Managers put it, the "fear factor" that makes for competition, or as we call it "competition"—out of their lease pricing.

62.    Thus, instead of pricing rental units unilaterally to entice renters, each Property Manager agrees to outsource setting its rental prices to Yardi to maximize rental rates. As Yardi explains in its marketing materials, "You manage your business, we manage your pricing." Statements like these make clear Yardi's pivotal role in each Property Manager's pricing decisions, to "manage" their pricing, not just suggest it.

63.    What is more, Yardi provides "Revenue Managers"—Yardi personnel—to "help" the Property Managers implement and maintain the prices Yardi sets. Property Managers repeatedly have lauded Yardi's Revenue Managers as important aides in encouraging, coaching, cajoling—and thus ensuring—that they charge the prices Yardi sets.

64.    Yardi has a very different pricing incentive compared to the incentive each Property Manager would have acting individually. Rather than lowering prices to meet competition, as each Property Manager would be forced to do in a competitive market, Yardi has the information necessary to maximize the rent of each Apartment, "push[ing] rents without sacrificing occupancy, [by] eliminat[ing] the fear factor of exposure that is a natural concern for property and regional

---

or as the starting point of a negotiation, the effect is the same: the Yardi-powered price coordination is a *per se* price-fixing violation of Section 1 of the Sherman Act.

FIRST AMENDED COMPLAINT

managers" in a functioning competitive market.[9] And far from performing this rent maximizing function behind the scenes, Yardi makes the fact and success of its illegal scheme the cornerstone of its marketing.

65.    Yardi's coordinated pricing is so effective that it can—and does—*guarantee* each Property Manager that its rental income will increase by 6% or more *over the revenue the Property Manager would have earned had it set its own prices in a competitive market*. Yardi can offer that guarantee only because it knows that its agreements with Property Managers replace the competition that would have reduced prices with the collusion that raises prices. Instead of dozens or hundreds of Property Managers competing for renters based on price, a single entity—Yardi—determines the price for all Property Managers. This eliminates all price competition among these Property Managers.

66.    It is an understatement to say that Defendants have admitted these facts. In numerous press releases, Yardi and the Property Managers have bragged gleefully that the price-fixing scheme had changed the Property Managers' pricing policies and increased the Property Managers' rental revenue per Apartment. The Defendants have proudly admitted that by providing Yardi with confidential pricing data and following Yardi's "recommended" rental prices based on that confidential pricing data collected in the Yardi Database, the Property Managers had increased revenue by at least 6%, eliminated the "uncertainty" and "guesswork" in rental pricing, and brought pricing "stability" to Apartment Markets – all artful ways of saying "eliminating competition and fixing prices."

---

[9] https://www.businesswire.com/news/home/20170616005099/en/Beztak-Grows-Rental-Income-with-Yardi-RENTmaximizer.

FIRST AMENDED COMPLAINT

## V.    DEFENDANTS COLLUDE TO SUPPLEMENT EACH PROPERTY MANAGERS' OWN PRICING DATA WITH COMPETITORS' PRICING DATA FOR THE PURPOSE OF FIXING THE PROPERTY MANAGERS' LEASING PRICES

67.    Yardi directs Property Managers to gather information from their competitors and enter that data into a "survey" section of RENTmaximizer. Yardi makes clear that it intends to use this data to price the Property Managers' leases: "to stay competitive in the market you must have a thorough understanding of what your Competitors are offering."

68.    Among the data the Property Managers collect for Yardi is "rental income, concessions, occupancy and rental rates."[10]

69.    In a competitive market, no Property Manager competing for business from prospective tenants would provide this detailed information to competitor Property Managers. That is why Yardi markets this data as a unique collection of information that gives its Property Manager customers an advantage over their competitors: Yardi advertises that its data allows Property Managers to "beat the market" using "pricing based on holistic revenue intelligence that leverages industry benchmarking, your local markets and economic trends."[11]

70.    Yardi and the Property Managers collect this data so that Yardi can be more accurate when it manages prices for all the Property Managers. Indeed, in RENTmaximizer Yardi characterizes "Comparison Rent"—meaning the rents charged by the Property Managers' competitors—as one of the "4 Basic Criteria for Price Changes." The other three are "availability, new leases, [and] traffic." Yardi defines "Comparison Rent" as "The ratio of your Communities average rent of all your Competitors comparable Unit Groups."

---

[10] https://www.yardi.com/products/yardi-revenue-iq/.

[11] https://resources.yardi.com/documents/revenue-iq-brochure/.

FIRST AMENDED COMPLAINT

71.     Moreover, RENTmaximizer explicitly includes the average of the "Comparison Rent" in calculating a Property Manager's leasing prices.

72.     Yardi tells Property Managers that the combination of the Property Managers' own proprietary data and the competitors' data allows a Property Manager to benchmark the pricing Yardi manages against every Property Manager in the Apartment Market: "With this transparent system you will see everything from rental rates and occupancy data to property performance benchmarking (compared to the market, submarket and competition)."[12]

73.     Yardi promises to compare the Property Manager's granular, detailed information to that of its competitors "in real time—including every comp and how you compete."[13]

74.     Yardi promises that its pricing management will accomplish something no Property Manager could do alone, indeed something that economic theory says cannot be done: "[p]rice leases to optimize [both] revenue *and* occupancy"[14] (emphasis added). This is quite a strong testimonial to Defendants' market power. As Yardi points out, this will "[d]rive revenue with clear, comprehensive metrics leveraging operational components including rental income, concessions, occupancy and rental rates—not just pricing."[15]

75.     According to Yardi, "[l]eases are priced by the system daily, which allows for fast adjustment to market conditions and changes in your inventory and traffic, while adjusting for cost constraints such as vacancy loss, turnover costs, inventory hold days and lease expiration management."[16]

---

[12] https://resources.yardi.com/documents/elevate-suite-for-multifamily-brochure/.

[13] https://www.yardi.com/products/yardi-revenue-iq/.

[14] https://resources.yardi.com/documents/revenue-iq-brochure/.

[15] https://www.yardi.com/products/yardi-revenue-iq/.

[16] *Id.*

FIRST AMENDED COMPLAINT

76.     Because the Property Managers know that Yardi pegs the pricing of any particular Property Manager to the pricing of every other Property Manager in the Apartment Market, the result is that each Property Manager "enjoy[s] greater confidence that you are delivering the best possible rental prices." And there is no ambiguity as to what "best" means: to Defendants, "the best possible rental prices" means the highest possible price—not the most competitive price and certainly not the best price for renters.

77.     Yardi's data is so comprehensive that Yardi can generate a near-real-time Unit Pricing Report ("UPR") at any time for a Property Manager. The UPR recommends pricing for a particular Property Manager based on competitor pricing in an Apartment Market for a specific unit type (*e.g.*, number of bedrooms and bathrooms). Yardi's recommendations are so sensitive to movements in a particular Apartment Market, that the UPR "is only valid for the current day (until midnight) not twenty-four (24) hours."

78.     Yardi has admitted that its data is not merely an accumulation of asking rates for its competitors' apartments, but "accurate indicators of … performance" that allow Property Managers to act on the data and increase the rental rates of their own apartments:

> This data delivers accurate indicators of economic trends and performance and helps you price apartments profitably. When this market-specific data is incorporated with your RENTmaximizer data, you can accurately benchmark performance and factor it into rent projections and calculations which enhances your revenue management strategy and helps boost the performance of individual assets.[17]

---

[17] https://resources.yardi.com/documents/elevate-suite-for-multifamily-brochure/.

- 25 -

FIRST AMENDED COMPLAINT

## VI.   YARDI'S REVENUE MANAGERS HELP TO MANAGE THE PROPERTY MANAGERS' PRICING

79.     Yardi provides Property Managers with Revenue Managers—Yardi employees that work with Property Managers to coordinate pricing more efficiently. Yardi's description of the role of the Revenue Manager makes this clear:

> ***You manage your business, we manage your pricing***. Only Yardi provides you with a dedicated revenue manager with valuable industry experience along with your revenue management software. Your dedicated revenue manager will get to know your business processes, assets and goals to provide superior support and will work with you to maximize your returns. And as a RENTmaximizer client, you'll receive this service and training continuously to promote ongoing success. (emphasis added)[18]

80.     Thanks to their dedicated Yardi Revenue Managers, Property Managers "[r]ely on a dedicated Yardi expert to help manage pricing."[19] More specifically, the Revenue Managers provide "pricing recommendations *and control pricing at the property level*."[20]

81.     The Revenue Managers are another mechanism by which Yardi helps perfect price collusion among Property Managers. The Revenue Managers help ensure that Property Managers use Yardi's "recommended" prices and make the price increases stick despite pushback from tenants. For example, Michael Hankin, Chief Operating Officer for Hankin Group, expressed gratitude to the Revenue Managers for their help in increasing Hankin's prices and therefore its revenue: "Thanks to Yardi RENTmaximizer, which works seamlessly with our Yardi … property management and accounting platform [software], our site managers no longer have to manually figure out competitive rents in their markets. After only 90

---

[18] *Id.*

[19] *Id.*

[20] *Id.* (emphasis added).

FIRST AMENDED COMPLAINT

days using Yardi RENTmaximizer, we've seen an effective rent growth of 5%."[21] Hankin specifically thanked the contribution and analysis from the Revenue Managers: "We really appreciate the support we get from the Yardi RENTmaximizer team—including weekly pricing calls with our dedicated revenue management expert. It's so advantageous to have their analysis and input on how we are pricing our properties relative to our markets and business goals."[22] Hankin referred to the Revenue Managers as his company's "safety net."[23]

82.    Adam Goldfarb, vice president for Property Manager Manco Abbott admitted that the Revenue Manager "can dig deeper to support our pricing—and that gives our organization and clients great confidence."[24] Ironically, "great confidence" means the belief by the Property Manager that Yardi's price increases will stick despite protests by individual tenants.

## VII.   YARDI'S PRICE-FIXING SCHEME RAISES RENTAL PRICES ABOVE A COMPETITIVE LEVEL

83.    Yardi itself has represented to Property Managers that its pricing management allows Property Managers to manage the supply of Apartment space to maximize rental income, which is important in a market with decreasing demand. In a promotional video posted on Facebook, Yardi boasted that RENTmaximizer allowed Property Managers to grow rental income by more than 6% per year "while maintaining or improving occupancy."[25] Yardi represented that its system was able

---

[21] https://media.whatcounts.com/sitestuff_yardi/2015_q2_mf/hankin.html.

[22] *Id.*

[23] *Id.*

[24] *Manco Abbott Inc. Achieves Rental Growth, Gains Expert Pricing Insight with Yardi RENTmaximizer*, Business Wire (Nov. 10, 2015), https://www.businesswire.com/news/home/20151110005039/en/.

[25] https://m.facebook.com/story.php?story_fbid=1501017369961971&id=109797229083999.

FIRST AMENDED COMPLAINT

to achieve these improbable results by analyzing "operational data" from competing Property Managers so that the Property Manager could respond quickly to pricing changes at comparable Apartments.

84.    Property Managers have enthusiastically and publicly lauded Yardi for allowing them to raise rental prices, eliminate discounts, and remove all uncertainty—meaning competition—from the pricing process.

85.    According to Mike Leja, Yardi administrator for Property Manager Singh Management, "We've been using Yardi RENTmaximizer for five months and we're already experiencing amazing results compared to the properties in our portfolio not yet using the system—our revenue is consistently higher for the Yardi RENTmaximizer properties. After the first month, the Yardi RENTmaximizer properties were performing at 7% higher, and by the fifth month, they reached rental growth of 18.5%." Leja added, "Even some high-occupancy properties achieved an average 10% occupancy jump using Yardi RENTmaximizer."[26]

86.    In 2016, Caroline Kane, Chief Executive Officer of CKR Property Management in Houston, said that, since implementing RENTmaximizer, "our rental revenue is up 8% year over year."[27] According to the Bureau of Labor Statistics ("BLS"), the inflation rate in 2016 ranged from 0.8% to 2.1%, meaning that Yardi's system allowed CKR to raise rental prices by more than four times the rate of inflation.

87.    Similarly, in December 2017, Sam Foster, Chief Executive Officer of Philadelphia-based Property Manager PRG Real Estate, said that since adopting

---

[26] https://www.businesswire.com/news/home/20160223005007/en/Singh-Management-Gains-Revenue-and-Occupancy-Growth-with-Yardi-RENTmaximizer.

[27] https://www.businesswire.com/news/home/20161027005063/en/CKR-Property-Management-Grows-Rental-Revenue-Yardi.

FIRST AMENDED COMPLAINT

RENTmaximizer in 2016, PRG's rental income had increased 19%, more than seven times the rate of inflation.[28]

88.    Sarah Oglesby-Battle, executive vice president of Property Manager Beztak Companies' management division, admitted that Yardi's system allowed Beztak to "push[] rents without sacrificing occupancy, which gives our staff confidence [and] eliminates the fear factor of exposure that is a natural concern for property and regional managers."[29]

89.    Brad Minsley, co-owner of Property Manager 10 Federal, admitted that Yardi's system allowed 10 Federal to raise prices and maintain occupancy rates above its competitors: "Yardi RENTmaximizer allows us to react much more dynamically in our pricing for down-trending markets and still maintain a 94 percent rate of pre-leased units, while our competitors are generally seeing about 70 percent." Minsley gushed that because of "Yardi RENTmaximizer we are signing new leases, our renewal rates are sustainable, and we don't have to offer concessions."[30]

90.    Philip Nored, owner and managing partner of Property Manager HNN Associates LLC, admitted that Yardi had removed all uncertainty from the pricing process: "RENTmaximizer has taken the guesswork out of our rental pricing and lease terms, and boosts pricing performance through an intelligent system of

---

[28] https://www.businesswire.com/news/home/20171214005468/en/PRG-Real-Estate-Sees-Double-Digit-Rent-Growth.

[29]  https://www.businesswire.com/news/home/20170616005099/en/Beztak-Grows-Rental-Income-Yardi-RENTmaximizer.

[30] https://www.businesswire.com/news/home/20150727005133/en/10-Federal-Increases-Rental-Income-with-Yardi-RENTmaximizer-Optimizes-Investor-Reporting-with-Yardi-Orion-Business-Intelligence.

FIRST AMENDED COMPLAINT

measurements, fixed factors and discipline."[31] "Guesswork" of course is another term for the uncertainty that drives competitive pricing.

91.    Yardi bragged that Property Manager Bridge Property Management used RENTmaximizer to increase rental income "9.4% year-over-year same store rental income growth for properties priced with Yardi RENTmaximizer (Q1 and Q2 2015 vs. Q1 and Q2 2014)."[32] According to BLS, the highest inflation rate in 2014 and 2015 was only 2.1%, meaning that RENTmaximizer allowed Bridge Property Management to raise rental prices at more than four times the rate of inflation. According to Terri Dowen, Yardi's senior vice president of sales, Bridge Property Management increased its occupancy rate at the same time it increased price so dramatically,[33] a feat impossible in a competitive market absent market power or illegal price fixing.

92.    Yardi highlighted the experience of Property Manager DEELS Properties, which had "achieved significant rental income gains using Yardi RENTmaximizer for its apartment communities in Los Angeles." Yardi admitted that these results were possible only because Yardi's system allowed DEELS to achieve a level of "transparency" that gave it insight into the pricing and operation details of its competitors. Ms. Dowen called this a "true competitive edge."[34] DEELS is now Defendant Balaciano.

---

[31] https://www.businesswire.com/news/home/20150217005101/en/HNN-Associates-LLC-Optimizes-Rental-Pricing-Performance-with-Yardi-RENTmaximizer.

[32] https://www.businesswire.com/news/home/20150929005288/en/Bridge-Property-Management-Gains-9.4-Year-Over-Year-Rental-Growth-with-Yardi-RENTmaximizer.

[33] *Id*.

[34] https://www.businesswire.com/news/home/20180226005236/en/DEELS-Properties-Results-Yardi-RENTmaximizer.

FIRST AMENDED COMPLAINT

93.     Amanda McHugh of the Rockbridge Group, noted that RENTmaximizer allowed her company to "achieve[] an average 48% increase in gross potential rent, even at properties undergoing renovations." As Yardi admitted, this was because Yardi's system "take[s] the guesswork [*i.e.*, the force that drives competition] out of pricing." Ms. McHugh agreed: "Thanks to RENTmaximizer, we have eliminated all concessions and specials. We have even renewed some leases at market rate." Ms. Dowen made this even more explicit: "By automating rental pricing that factors in portfolio and market data, RENTmaximizer not only improves rental income while maintaining occupancy, it simplifies the process by eliminating rent rate guesswork and traditional sales devices such as concessions and specials."[35]

## VIII.  YARDI'S PRICE-FIXING SCHEME ALSO HAS HARMED RENTERS IN OTHER LEASE TERMS RELATING TO PRICE

94.     The collusion among Yardi and the Property Managers harms consumers in other ways relating to price. In a competitive market Property Managers meet tenant demand by offering leases with a range of durations because the Property Managers would be uncertain whether a single short-term offering to each tenant—say, one year—would allow Property Managers to respond quickly enough to changing economic conditions. Yet, the certainty that Yardi's pricing "transparency" brings to Property Managers—meaning accurate and timely knowledge of what their competitors are doing—makes longer-term leases unnecessary because the Property Managers know that Yardi will be able to track changing pricing across their market in real time. Yardi Property Managers know that, unlike in a competitive market, they will not be blindsided by sudden pricing changes by their competitors.

---

[35] https://www.businesswire.com/news/home/20160621005024/en/Rockbridge-Group-Increases-Rent-Revenue-Yardi-RENTmaximizer.

FIRST AMENDED COMPLAINT

95.    Amanda Smeltzer, executive director at Property Manager Banyan Living, succinctly articulated this dynamic. The certainty Yardi offered allowed Banyan "to find structure and stability in our GPR, versus making our best guess at what it should be."[36] "GPR" is gross potential rent, meaning the hypothetical revenue a Property Manager could earn if its units were fully rented throughout a particular year at market rents. A Property Manager typically must estimate its GPR because it does not know what its competitors will charge and on what terms. Coordination enabled by Yardi based on its collection of the Property Managers' information eliminates those uncertainties, allowing Property Managers to calculate their GPR precisely. This eliminates the need for Property Managers to offer more favorable terms to renters.

96.    For this reason, Banyan moved from offering renters a range of lease-terms to offering only short-term leases that allowed Banyan to take advantage of short-term price movements in a particular Apartment Market: "Prior to RENTmaximizer, we hesitated to offer short-term leases. Now we confidently offer them for both new and renewal leases. As a result, we've seen positive rent growth."[37] Leases typically restrict price increases during a lease-term, but by forcing more frequent lease renewals, short-term leases allow Property Managers to increase rents more frequently.

97.    Moreover, Yardi's admitted ability to restrict output—*i.e.*, limit the availability of units to maintain artificially high lease prices—protects Property Managers from the problems short-term leases might otherwise pose when real estate markets are declining. As Yardi admits, Defendants' unlawful price-fixing

---

[36] https://www.businesswire.com/news/home/20161213005313/en/Banyan-Living-Achieves-Rent-Growth-Yardi-RENTmaximizer.

[37] *Id.*

FIRST AMENDED COMPLAINT

scheme maintains occupancy rates by manipulating inventories of available units. This maintains prices even in down real estate markets.

98.   This goes a long way to explaining what has happened in the market generally. BLS reports that leases of longer than one year have virtually disappeared. Of all leases between January and June 2022, less than 9% were longer than one year. And even one-year leases become less common the longer a tenant lives in an Apartment. The BLS reports that of the tenants who lived in the same unit for five or more years, only 49.7% had a twelve-month lease, while 50.3% had month-to-month leases, meaning 0% (allowing for rounding) had leases for a period longer than twelve months.

99.   The reason for favoring these shorter lease durations and increasing tenant churn is obvious: it allows Property Managers to increase rents more frequently. The BLS reports that in the first half of 2022, the average percentage change in rent was 12% for new tenants, but only 3.5% for renewing tenants (*i.e.*, tenants who had a lease renewal within the previous six months).

100.  Short-term leases are more profitable for Property Managers, and Yardi-based price collusion has made short-term leases ubiquitous in Apartment Markets around the country.

IX.   **"PLUS FACTORS" EXCLUDE THE POSSIBILITY OF INDEPENDENT ACTION**

101.  Several so-called "Plus Factors" enhance the vivid picture of collusion in Apartment Markets provided by the direct evidence of Yardi's and the Property Managers' admissions and tend to exclude the possibility that Defendants' actions were independent and motivated by an intent to compete.

102.  *First*, the Property Managers submit their competitively sensitive pricing data to Yardi knowing that all the Property Managers are doing the same and that Yardi will use that data to coordinate leasing prices among the Property

FIRST AMENDED COMPLAINT

Managers. That is the very essence of the Yardi contract with Property Managers. This coordination is inconsistent with independent action motivated by an intent to compete, which would drive Property Managers to zealously protect this competitively sensitive information from their competitors.

103.  *Second*, the Property Managers' agreement not to compete on price with the knowledge that prices will therefore be higher than they would be without coordination is against their self-interest in a competitive market. Property Managers acting independently and motivated to compete for renters would use *lower* prices to entice renters and increase occupancy rates; that is the very essence of pricing in a competitive market. Thus, the Property Managers' conduct in having Yardi manage to *higher* prices is inconsistent with a conclusion that they are acting independently to compete more effectively.

104.  *Third*, Yardi actively creates and supports so-called User Groups made up of Property Managers in Apartment Markets that Yardi uses as conduits for refining and perfecting their unlawful collusion. Yardi's support of these User Groups and the Property Managers' participation in them to further share competitively sensitive information is inconsistent with the Property Managers acting unilaterally in competition with each other and is powerful evidence that the Defendants are coordinating and colluding, not competing.

105.  Yardi currently supports User Groups in Arizona, Atlanta, Central and South Texas, Chicago, Denver, Dallas, Hawaii, Minneapolis, Nebraska, Nevada, New England, New York, North Carolina, the Pacific Northwest, San Francisco, Toronto, and Washington, D.C.[38] Yardi has admitted that these User Groups "facilitate the exchange of information" among Property Managers. According to

---

[38] https://web.archive.org/web/20230311055157/https://www.yardi.com/services/user-groups/.

FIRST AMENDED COMPLAINT

Yardi these User Groups "provide[] a professional forum to exchange experience and ideas with peers . . . ."[39]

106.   To hide the activities and effects of these User Groups, Yardi does not publish the identity of their members. Indeed, Yardi now hides the existence of the User Groups. Both these actions are evidence of Yardi's increasing awareness that User Group activities and the consequences of those activities are anticompetitive and unlawful.

107.   Yardi also employs "independent consultants" to "access and use … Yardi software [such as RENTmaximizer] to perform implementation, training, and other permitted consulting services."[40] These independent consultants also organize User Groups and User Group meetings[41] to, among other things, facilitate the exchange of information among Property Managers.

108.   *Fourth*, the high barriers to entry in the Apartment Markets make it easier for Defendants to form and maintain their unlawful conspiracy and their unlawful price-fixing agreement. The Property Managers have little reason to worry that an upstart competitor will upset their unlawful pricing scheme because the barriers to entry discourage such competitors from entering the market. There are two reasons for this. First, the Yardi/Property Manager price fixing raises the overall market prices and therefore enables non-Yardi Property Managers also to raise their prices; so they are also better off financially enjoying the benefits of that price fixing than challenging it. Second, a true new entrant would have to construct or take over enough units to have any effect on the price fixing, but once in the market would instead choose to benefit from the scheme.

---

[39] *Id.*

[40] https://www.yardi.com/services/independent-consultants/#:~:text=Lynx%20Systems%20Inc.%20–%20US.

[41] https://lynxsystemsinc.com/event/dallas-user-group/.

FIRST AMENDED COMPLAINT

109. *Fifth*, the concentration among Property Managers creates opportunities for further collusion and communication. Virtually all the Property Manager Defendants manage Apartments in multiple markets across the country. This substantial overlap of the Property Managers' operations allows them to communicate efficiently and continuously about their unlawful pricing scheme across multiple Apartment Markets. That opportunity to communicate is an opportunity to collude, to coordinate their actions, and to police the terms of the unlawful price-fixing scheme.

## X.    MARKET DEFINITION AND YARDI'S MARKET POWER

110.   The relevant product market is the market in which Property Managers use Yardi services: the leasing of what Yardi itself defines as Mid-Range and High-End Apartments.

111.   Yardi sets these segments apart on its website as distinct segments within the multifamily residential space and it rates Apartments within these segments from A+ to B-.[42] Mid-Range Apartments cater to working professionals, police officers, firefighters, teachers, and technical workers. High-End Apartments cater to discretionary renters, such as households with more income but without wealth and households capable of owning a residence, but who choose to rent.[43]

112.   Renters of these Apartments do not consider purchasing housing as a reasonable substitute for renting Apartments primarily because of the down payment needed to purchase long-term housing and the need to occupy the housing for a long period of time to make the initial down payment economically worthwhile. In

---

[42] https://www.yardi.com/About-Us/Our-Methods/How-We-Define-The-Apartment-Supply/Property-Ratings.

[43] https://www.yardimatrix.com/About-Us/Our-Methods/How-We-Define-The-Apartment-Rental-Market.

FIRST AMENDED COMPLAINT

addition, renters of these Apartments value the convenience of renting housing over the responsibility for maintaining that housing.

113.    The relevant geographic markets are the individual markets within which Property Managers compete for renters and is no larger than the Metropolitan Statistical Areas ("MSAs") as defined by the United States Bureau of Statistics, within which Yardi provides its relevant services to Property Managers of Mid-Range and High-End Apartments.

114.    As Yardi has asserted in its marketing materials: (a) Each such geographic market within which Property Managers compete for renters corresponds to an MSA. Within each MSA the geographic market may be further defined within a micro to a macro range. (b) At its smallest, the geographic market may be limited to a radius extending from one to five miles surrounding a particular property. (c) The geographic market may also be defined according to properties within a zip code or combination of zip codes.[44]

115.    Yardi has market power within each of these Apartment Markets. The direct evidence of this market power is Yardi's admitted and proven ability to raise price *and* restrict output. Yardi has admitted that it can increase rental prices within these markets by 6% or more. Yardi also has admitted that it can manage a Property Manager's inventory to maximize the Property Manager's revenue, even if that means keeping units off the market to maintain the price of other units.

116.    This ability to increase price *and* reduce output—factors that are inversely related in a competitive market—is direct evidence of Defendants' market power and no further allegations regarding proxies for the Defendants' market power are necessary.

---

[44] *Id.*

- 37 -

FIRST AMENDED COMPLAINT

117.   In any event, Plaintiffs' allegations of the relevant markets and Defendants' market power within those markets are sufficient even when analyzed on the basis of indirect evidence. Yardi has admitted that Defendants can increase lease prices by at least 6% without reducing occupancy rates. This admission satisfies the so-called SSNIP test, which asks whether a monopolist may profitably impose a hypothetical small, but significant, non-transitory increase in price (hence "SSNIP") without causing a reduction in revenue that renders the increase unprofitable. The SSNIP test normally assumes a hypothetical price increase of 5% and holds that if a hypothetical price increase of 5% would be profitable, the plaintiff has defined the market properly.

118.   Here, the price increase is not hypothetical, but actual and admitted, and is larger than 5%. Defendants have admitted that they have profitably increased lease prices by at least 6%—*i.e.*, without decreasing occupancy rates that would make the price increase unprofitable. Because Defendants have acknowledged that their 6% price increases have not decreased revenues in a way that has rendered the increases unprofitable, Plaintiffs' allegations satisfy the SSNIP test, and they have properly defined the relevant market.

119.   The fact that the Defendants' price increases are real and not hypothetical and that they satisfy the SSNIP test is perhaps the single most significant accomplishments of their illegal collusion: without changing ownership of any of the Property Managers the Defendants have gained the market power and the resulting pricing power that they could have accomplished otherwise only by a merger of all the Property Managers. That merger would be unlawful because it would give the merged Property Manager power to raise price 6%. It cannot then be lawful for the Defendants to have accomplished by agreement—the simple but powerful agreement to outsource their pricing to a single decision maker—what they would be prohibited from accomplishing by merger.

FIRST AMENDED COMPLAINT

120.   What is more, Yardi has admitted that "its customers represent roughly 50% of the US multifamily market."[45] Given that the multifamily market encompasses far more than the Mid-Range and High-End segments to which Plaintiffs' market definition is limited, Yardi's market share in the Apartment Markets is far higher than 50%. This is more than sufficient to satisfy the minimum market share required to suggest that the Defendants possess market power, if resort to such indirect evidence is necessary. And when combined with Yardi's admitted power to raise price and reduce output, Plaintiffs' market share allegation would be sufficient to satisfy Plaintiffs' initial burden of establishing their *prima facie* case.

# XI.   CLASS ACTION ALLEGATIONS

121.   Pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(2) and 23(b)(3), Plaintiffs bring this action for themselves and on behalf of the following Class:

> All persons or entities in the United States that leased Mid-Range or High-End Apartment units, at any time beginning September 8, 2019, until the anticompetitive acts end, from a Property Manager that entered the conspiracy with Yardi to fix Apartment lease prices.

122.   Plaintiffs and the members of the Class are seeking damages and an injunction to remedy Defendants' violations alleged herein.

123.   The Class is readily ascertainable, and the members of the Class are readily identifiable from information and records maintained by Defendants.

124.   Members of the Class are so numerous that joinder of all members is impracticable.  The members of the Class are numerous and widely dispersed throughout the United States.

125.   Plaintiffs' claims are typical of the claims of the members of the Class. Within the Class, Plaintiffs' interests are not antagonistic to the claims of the other

---

[45] https://resources.yardi.com/documents/pere-keynote-interview-creating-efficiency-in-u-s-multifamily/.

FIRST AMENDED COMPLAINT

members of the Class, and there are no material conflicts with any other members of the Class that would make class certification inappropriate. Plaintiffs and all members of the Class were damaged by the same wrongful conduct of Defendants.

126. Plaintiffs will fairly and adequately protect and represent the interests of the members of the Class. The interests of the Plaintiffs are coincident with, and not antagonistic to, those of the members of the Class.

127. Plaintiffs are represented by counsel (Competition Law Partners PLLC and Don Bivens PLLC) who are experienced and competent in the legal issues involved in this Complaint and in the prosecution of class action litigation.

128. Questions of law and fact common to the members of the Class predominate over questions that may affect only individual Class members because Defendants have acted on grounds generally applicable to the entirety of the Class, thereby determining damages with respect to the Class as a whole is appropriate. Such generally applicable conduct is inherent in Defendants' wrongful conduct.

129. There are legal and factual questions common to the Class, which do not vary from Class member to Class member and which may be determined without reference to individual circumstances of any Class member. These include, but are not limited to, the following:

(a) Whether a Class member's Property Manager uses Yardi RENTmaximizer;

(b) Whether a Class member's Property Manager has provided confidential information, including price information, to Yardi;

(c) Whether a Class member's Property Manager has supplied detailed information to Yardi regarding the apartment offerings of competitor Property Managers that do not purchase software services from Yardi;

(d) Whether a Class member's Property Manager has given Yardi authority to manage the pricing of the Property Manager's Apartments;

FIRST AMENDED COMPLAINT

(e)     Whether the conduct alleged herein violated Section 1 of the Sherman Act, 15 U.S.C. § 1;

(f)     Whether the Class is entitled to the injunctive relief sought.

130.    Class action treatment is a superior method to other available methods for the fair and efficient adjudication of the controversy. The prosecution of separate actions by individual members of the Class would impose heavy burdens on the courts and Defendants and would create a risk of inconsistent or varying adjudications of the questions of law and fact common to the Class. Class action treatment will permit many similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, or expense that numerous individual actions would engender, and would assure uniformity of decision as to persons similarly situated without sacrificing procedural fairness or bringing about other undesirable results. The benefits of proceeding through the class mechanism, including providing injured persons or entities a method for obtaining redress on claims that could not practicably be pursued individually, substantially outweigh any potential difficulties in management of this class action.

131.    Plaintiffs know of no special difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

## XII.  CLAIMS FOR RELIEF

### First Claim for Relief

**(Conspiracy in Violation of Section 1 of the Sherman Act)**

**(On Behalf of the Class Against All Defendants)**

132.    Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

133.    The Defendants conspired to unlawfully fix prices of the Property Managers' leases in particular Apartment Markets. As part of this conspiracy, the

FIRST AMENDED COMPLAINT

Property Managers agreed not to compete based on price. Defendants' unlawful price-fixing agreement raises the rental prices tenants pay and eliminates price competition among Property Managers.

134. This price-fixing conspiracy is a *per se* violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

135. Plaintiffs and members of the Class were harmed and are being harmed by Defendants' conduct because they were deprived and are being deprived of a competitive market in which to obtain the leasing of Apartment units, and as a result had to pay leasing fees that were and are unwarranted and unlawful.

136. Defendants' conduct was and is a substantial factor in causing Plaintiffs' harm.

### Second Claim for Relief

**(Unlawful Agreement in Violation of Section 1 of the Sherman Act)**

**(On Behalf of the Class Against All Defendants)**

137. Plaintiffs incorporate by reference the preceding paragraphs of this Complaint.

138. The Defendants entered an unlawful price-fixing agreement. The Property Managers provided Yardi with competitively sensitive price information, which Yardi used to set prices among the Property Managers in particular Apartment Markets. As part of the unlawful conspiracy, the Property Managers agreed not to compete based on price. Defendants' unlawful agreement raises the rental prices tenants pay and eliminates price competition among Property Managers.

139. The agreement is an unreasonable restraint of trade in violation of Section 1, 15 U.S.C. § 1.

140. The purpose and effect of this agreement was to restrain competition in Apartment Markets.

FIRST AMENDED COMPLAINT

141.    Plaintiffs and members of the Class were harmed and are being harmed by Defendants' conduct because they were deprived and are being deprived of a competitive market in which to obtain the leasing of Apartment units, and as a result had to pay leasing fees that were and are unwarranted and unlawful.

142.    There is no procompetitive justification for Defendants' unlawful conduct. Even if, contrary to fact, there were assumed to be a procompetitive justification, the unlawful conduct was not necessary to achieve any such procompetitive purpose, which could have been realized by less restrictive alternatives, and the anticompetitive effects of Defendants' conduct have far outweighed the procompetitive benefits.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs seek the following relief:

a.    An order declaring that Defendants have engaged in anticompetitive conduct in violation of Section 1 of the Sherman Act;

b.    An order declaring that this action may proceed as a class action on behalf of the Class;

c.    An injunction permanently enjoining and restraining Defendants from continuing the unlawful conduct under Section 16 of the Clayton Act, 15 U.S.C. § 26;

d.    A judgment awarding Plaintiffs actual damages trebled (*i.e.*, three times the amount by which the Defendants' actions increased the rent Plaintiffs paid), in an amount to be determined at trial;

e.    A judgment awarding attorneys' fees and costs of suit;

f.    A judgment awarding all available pre-judgment and post-judgment interest, to the fullest extent available under law or equity; and

g.    An order or judgment awarding such other further relief as allowed by law.

FIRST AMENDED COMPLAINT

1

## **<u>JURY DEMAND</u>**

2

Plaintiffs request a trial by jury, pursuant to Rule 38(b) of the Federal Rules

3

of Civil Procedure.

4

Dated: August 19, 2024

5

6

*/s/ Leiv Blad*

Leiv Blad (Bar. No. 151353)

7

Jeffrey Blumenfeld (*pro hac vice*)

Meg Slachetka (*pro hac vice*)

8

COMPETITION LAW PARTNERS PLLC

9

1101 Pennsylvania Avenue, NW

Washington, DC  20004

10

Telephone: (202) 742-4300

11

Facsimile: (202) 810-9815

12

13

Don Bivens (*pro hac vice*)

don@donbivens.com

14

Teresita Mercado (*pro hac vice*)

15

teresita@donbivens.com

Don Bivens PLLC

16

15169 N. Scottsdale Road

17

Suite 205

Scottsdale, AZ 85254

18

Telephone: (602) 708-1450

19

20

Scott D. Tenley

scott@tenleylaw.com

21

TENLEY LAW, P.C.

620 Newport Center Dr., Suite 1100

22

Newport Beach, CA 92660

23

Telephone: (949) 749-2300

24

*Attorneys for Plaintiffs*

25

26

27

28

- 44 -

FIRST AMENDED COMPLAINT