1  DEBEVOISE & PLIMPTON LLP
2  Abraham Tabaie (SBN 260727)
   atabaie@debevoise.com
3  David Sarratt (SBN 332438)
   dsarratt@debevoise.com
4  650 California Street
5  San Francisco, CA 94108
   Telephone:  (415) 738-5700
6  Facsimile:   (415) 644-5628

7  SPERTUS, LANDES & JOSEPHS, LLP
8  Kevin J. Minnick (SBN 269620)
   kminnick@spertuslaw.com
9  617 West 7th Street, Suite 200
   Los Angeles, California 90017
10 Telephone:  (213) 205-6520
11 Facsimile:   (213) 205-6521

12 *Attorneys for Defendant Yardi Systems, Inc.*

13 *(Additional Counsel Listed on Signature Page)*

14
15                UNITED STATES DISTRICT COURT

16       CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

17 DANIEL FRANK, *et al.*,              Case No. 8:24-cv-00617-JAK-DFM

18 on behalf of themselves and all others   **DEFENDANTS' OMNIBUS**
   similarly situated,                   **MOTION TO DISMISS FIRST**
                                         **AMENDED CLASS ACTION**
19            Plaintiffs,               **COMPLAINT**

20      v.                              Date:      February 24, 2025
21 YARDI SYSTEMS, INC., *at al*.,        Time:      8:30 A.M.
                                        Ctrm:      10C
22            Defendants.               Judge:     Hon. John A. Kronstadt

23
24
25
26
27
28
                              1
                 DEFENDANTS' OMNIBUS MOTION TO DISMISS

***TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:***

**PLEASE TAKE NOTICE** that on February 24, 2025, at 8:30 A.M., subject to the Court's availability, in Courtroom 10C, located at the First Street Courthouse, 350 West First Street, Los Angeles, CA, 90012, Defendants 10 Federal Management LLC, Asset Living, LLC, Avenue5 Residential, LLC, Balaciano Group, Continental Realty Corp., Essex Property Trust, Inc., FPI Management, Inc., Greystar Real Estate Partners, LLC, Lincoln Property Company, RAM Partners, LLC, RPM Living, LLC, Western National Property Management, and Yardi Systems, Inc. ("Defendants"), will and hereby do move pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) for an Order dismissing the First Amended Class Action Complaint (the "FAC") for lack of standing and failure to state a claim.

As explained in the accompanying memorandum of points and authorities, Plaintiffs' claims are subject to dismissal for several reasons. First, Plaintiffs lack Article III and antitrust standing because their apartments were not priced using Yardi's revenue management software, and thus they did not suffer an injury traceable to the alleged conspiracy. Second, Plaintiffs fail to allege a core requirement for a price-fixing conspiracy: evidence of an unlawful agreement. Third, Plaintiffs fail to allege circumstantial evidence of a conspiracy, such as "parallel conduct" by each Defendant and "plus factors" to support those allegations. Lastly, even if an unlawful agreement had been alleged, *per se* treatment would not apply. Rather, the claims must be analyzed under the rule of reason, but they fail there too because the FAC does not plausibly allege a relevant product market, relevant geographic market, or market power.

This Motion is made following the conference of counsel pursuant to L.R. 7-3, which took place on September 20, 2024.

Dated: September 30, 2024

Respectfully submitted,
By: */s/ Abraham Tabaie*
Abraham Tabaie (SBN 260727)
*All Additional Signatories Listed At End*

# **TABLE OF CONTENTS**

**Page**

BACKGROUND ................................................................................................11

    I.     Yardi's revenue management product ...........................................11

    II.    The Manager Defendants ..............................................................12

    III.   The alleged conspiracy .................................................................12

    IV.   Plaintiffs' causes of action ............................................................13

ARGUMENT ....................................................................................................13

    I.     Plaintiffs lack standing ..................................................................14

    II.    The FAC fails to allege an unlawful agreement............................18

        A.   Plaintiffs fail to allege direct evidence of an agreement....................19

        B.   Plaintiffs fail to allege circumstantial evidence of an agreement.......25

    III.   Even if an agreement was alleged, *per se* treatment would not apply..........31

    IV.   The FAC fails to state a claim under the rule of reason................................33

        A.   Plaintiffs fail to allege a plausible relevant market ............................33

        B.   Plaintiffs fail to allege market power.........................................36

CONCLUSION ..................................................................................................38

DEFENDANTS' OMNIBUS MOTION TO DISMISS

# TABLE OF AUTHORITIES

*Allen v. Wright*,
    468 U.S. 737 (1984)...................................................................................14

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)...................................................................................18

*Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*,
    166 F. Supp. 3d 988 (N.D. Cal. 2015)......................................................20

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).................................................................18, 25, 30

*Blum v. Yaretsky*,
    457 U.S. 991 (1982)...................................................................................15

*Bona Fide Conglomerate, Inc. v. SourceAmerica*,
    691 F. App'x 389 (9th Cir. 2017) .......................................................21, 29

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993)...................................................................................26

*Calabasas Luxury Motorcars, Inc. v. Mercedes-Benz USA, LLC*,
    2022 WL 19076646 (C.D. Cal. Sept. 30, 2022) .......................................35

*Cha-Car, Inc. v. Calder Race Course, Inc.*,
    752 F. 2d 609 (11th Cir. 1985) ..................................................................29

*City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*,
    92 F.4th 381 (2d Cir. 2024) .......................................................................29

*Concord Assocs., L.P. v. Entm't Props. Tr.*,
    817 F.3d 46 (2d Cir. 2016) .........................................................................34

*Coronavirus Rep. v. Apple, Inc.*,
    85 F.4th 948 (9th Cir. 2023) ......................................................................36

*Dalfio v. Orlansky-Wax, LLC*,
    2022 WL 3083323 (9th Cir. Aug. 3, 2022) .......................................15

*Dickson v. Microsoft Corp.*,
    309 F.3d 193 (4th Cir. 2002) .....................................................................37

4

DEFENDANTS' OMNIBUS MOTION TO DISMISS

*Eclectic Props. E., LLC v. Marcus & Millichap Co.*,
 751 F.3d 990 (9th Cir. 2014) ............................................................29

*Erie Cnty. v. Morton Salt, Inc.*,
 702 F.3d 860 (6th Cir. 2012) ............................................................31

*Expert Masonry, Inc. v. Boone Cnty., Ky.*,
 440 F.3d 336 (6th Cir. 2006) ............................................................32

*Fed. Trade Comm'n v. Microsoft Corp.*,
 681 F. Supp. 3d 1069 (N.D. Cal. July 10, 2023) ............................36

*Flaa v. Hollywood Foreign Press Ass'n*,
 55 F.4th 680 (9th Cir. 2022) ...............................................33, 36, 38

*Gerlinger v. Amazon.com Inc.*,
 526 F.3d 1253 (9th Cir. 2008) ..........................................................15

*Gibson v. Cendyn Grp., LLC*,
 2024 WL 2060260 (D. Nev. May 8, 2024) (*Gibson II*)..............*passim*

*Gold Medal LLC v. USA Track & Field*,
 187 F. Supp. 3d 1219 (D. Or. 2016) .................................................36

*Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*,
 433 F. App'x 598 (9th Cir. 2011) ......................................................35

*Hicks v. PGA Tour, Inc.*,
 897 F.3d 1109 (9th Cir. 2018) ...............................................33, 35, 36

*Hip Hop Beverage Corp. v. Monster Energy Co.*,
 733 F. App'x 380 (9th Cir. 2018) ...............................................36, 37

*Honey Bum, LLC v. Fashion Nova, Inc.*,
 63 F.4th 813 (9th Cir. 2023) .............................................................19

*In re Amazon.com, Inc. eBook Antitrust Litig.*,
 2023 WL 6006525 (S.D.N.Y. July 31, 2023)....................................37

*In re Dynamic Random Access Memory (DRAM)*
  *Indirect Purchaser Antitrust Litig.*,
 28 F.4th 42 (9th Cir. 2022) ...............................................................29

5

DEFENDANTS' OMNIBUS MOTION TO DISMISS

*In re Elevator Antitrust Litig.*,
    502 F.3d 47 (2d Cir. 2007) ..................................................................27

*In re German Auto. Mfrs. Antitrust Litig.*,
    392 F. Supp. 3d 1059 (N.D. Cal. 2019)..............................................30

*In re German Auto. Mfrs. Antitrust Litig.*,
    497 F. Supp. 3d 745 (N.D. Cal. 2020)................................................35

*In re German Auto. Mfrs. Antitrust Litig.*,
    612 F. Supp. 3d 967 (N.D. Cal. 2020)................................................33

*In re Musical Instruments & Equip. Antitrust Litig.*,
    798 F.3d 1186 (9th Cir. 2015) .....................................................*passim*

*In re Pork Antitrust Litig.*,
    2019 WL 3752497 (D. Minn. Aug. 8, 2019) ......................................27

*In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*,
    709 F. Supp. 3d 478 (M.D. Tenn. 2023) ................................26, 32, 33

*In re Se. Milk Antitrust Litig.*,
    739 F.3d 262 (6th Cir. 2014) ..............................................................33

*In re Text Messaging Antitrust Litig.*,
    630 F.3d 622 (7th Cir. 2010) ..............................................................19

*Jacobs v. Tempur-Pedic Int'l, Inc.*,
    626 F.3d 1327 (11th Cir. 2010) ..........................................................26

*Jones v. Micron Tech. Inc.*,
    400 F. Supp. 3d 897 (N.D. Cal. 2019)................................................31

*Kaufman v. Time Warner*,
    836 F.3d 137 (2d Cir. 2016) ...............................................................38

*Kendall v. Visa U.S.A., Inc.*,
    518 F.3d 1042 (9th Cir. 2008) ..............................................18, 20, 21

*Lazy Y Ranch Ltd. v. Behrens*,
    546 F.3d 580 (9th Cir. 2008) ..............................................................11

*Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*,
    140 F.3d 1228 (9th Cir. 1998) ............................................................15

6

DEFENDANTS' OMNIBUS MOTION TO DISMISS

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992)................................................................................15

*Mach, et al. v. Yardi Systems*, *Inc., et al.*,
    No. 24-CV-063117 (Cal. Super. Ct.)..................................................24

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp*.,
    475 U.S. 574 (1986)................................................................................29

*Med Vets Inc. v. VIP Petcare Holdings, Inc*.,
    2019 WL 1767335 (N.D. Cal. Apr. 22, 2019)....................................36

*Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co*.,
    838 F.3d 421 (3d Cir. 2016) ...............................................................36

*Netafim Irrigation, Inc. v. Jain Irrigation, Inc*.,
    562 F. Supp. 3d 1073 (E.D. Cal. 2021) .............................................33

*Okl. Firefighters v. Deutsche Bank*,
    2024 WL 4202680 (S.D.N.Y. Sept. 13, 2024) .................................18

*Prosterman v. Am. Airlines, Inc*.,
    747 F. App'x 458 (9th Cir. 2018) ......................................................25

*PSKS, Inc. v. Leegin Creative Leather Prods., Inc*.,
    615 F.3d 412 (5th Cir. 2010) ..............................................................19

*R.C. Dick Geothermal Corp. v. Thermogenics, Inc*.,
    890 F.2d 139 (9th Cir. 1989) ..............................................................16

*Real Est. Exch., Inc. v. Zillow, Inc*.,
    2023 WL 5278115 (W.D. Wash. Aug. 16, 2023)..............................19

*Reilly v. Apple Inc*.,
    578 F. Supp. 3d 1098 (N.D. Cal. 2022)........................................34, 35

*Reveal Chat Holdco, LLC v. Facebook, Inc*.,
    471 F. Supp. 3d 981 (N.D. Cal. 2020)................................................15

*Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc*.,
    2013 WL 5694452 (N.D. Cal. Oct. 18, 2013) ...................................38

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC*,
    532 F.3d 963 (9th Cir. 2008) .......................................................19, 29

7

*Safe Air for Everyone v. Meyer*,
  373 F3d 1035 (9th Cir. 2004) ................................................................15

*Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*,
  950 F.3d 911 (7th Cir. 2020) ................................................................34

*Sidibe v. Sutter Health*,
  4 F. Supp. 3d 1160 (N.D. Cal. 2013) ....................................................34

*Steel Co. v. Citizens for a Better Env't*,
  523 U.S. 83 (1998) ................................................................................14

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ..............................................................................15

*Texaco Inc. v. Dagher*,
  547 U.S. 1 (2006) ............................................................................31, 32

*Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*,
  552 F.3d 430 (6th Cir. 2008) ...........................................................19, 20

*TransUnion LLC v. Ramirez*,
  594 U.S. 413 (2021) ..............................................................................15

*U.S. v. Conn. Nat'l Bank*,
  418 U.S. 656 (1974) ..............................................................................34

*United States et al. v. RealPage, Inc.*,
  No. 1:24-cv-00710 (M.D.N.C. Aug, 23, 2024) ....................................38

*Universal Grading Serv. v. eBay, Inc.*,
  2012 WL 70644 (N.D. Cal. Jan. 9, 2012) .............................................35

*William O. Gilley Enters., Inc. v. Atl. Richfield Co.*,
  588 F.3d 659 (9th Cir. 2009) ................................................................19

*Winsor v. Sequoia Benefits & Ins. Servs., LLC*,
  62 F. 4th 517 (9th Cir. 2023) ................................................................15

8

DEFENDANTS' OMNIBUS MOTION TO DISMISS

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiffs are five tenants seeking to manufacture Sherman Act claims based on independent decisions by 14 property managers (the "Manager Defendants") to allegedly use Yardi's revenue management software, Revenue IQ.[1] Plaintiffs allege, without any factual support, that the managers somehow conspired to, and succeeded in, inflating apartment rents nationwide merely by licensing Yardi's Revenue IQ product. The only alleged commonality is that the Manager Defendants (*i*) "provide[] apartment management services" in unidentified locations and (*ii*) contracted with Yardi for undefined products or services, in unidentified geographic markets, at some unidentified time, for unspecified properties. With these threadbare allegations, Plaintiffs seek to drag Defendants into a sprawling nationwide antitrust conspiracy case.

**Plaintiffs lack standing because their apartment buildings did not use Revenue IQ.** The claims of all five putative class representatives fail because the properties where they rented apartments *never* used Revenue IQ. Under Rule 12(b)(1), the Court need not accept the FAC's vague allegations to the contrary, particularly given the conclusive extrinsic proof accompanying this motion, which the Court must consider in evaluating whether the Plaintiffs lack standing. Plaintiffs were not harmed by any alleged conspiracy to inflate their rents using Yardi's revenue management software, and therefore they have suffered no injury traceable in any way to Revenue IQ. Nor could an order from the Court redress an injury when Revenue IQ was never used at Plaintiffs' buildings. Plaintiffs lack standing to pursue their claims, and the case should be dismissed.

**The FAC is devoid of factual allegations pleading a viable antitrust claim.** Plaintiffs' allegations about Revenue IQ cannot meet the plausibility standard by any measure. Plaintiffs baldly assert that the Manager Defendants all agreed to use Revenue IQ to artificially raise apartment prices nationwide. FAC ¶ 3. But the FAC does not allege a single fact suggesting the existence of such an agreement.

---

[1] Plaintiffs assert that Revenue IQ was previously named RENTmaximizer. FAC ¶ 6 n.1. This motion uses Revenue IQ, the product's name since 2020.

DEFENDANTS' OMNIBUS MOTION TO DISMISS

No basic facts about the purported conspiracy are pled, such as when an agreement was formed, by whom, or what was specifically agreed to. Plaintiffs instead lump the Manager Defendants together and make identical boilerplate allegations that they entered into a "contract" with Yardi. Plaintiffs also fail to allege any parallel conduct that could plausibly suggest a tacit agreement to fix prices. There are no factual allegations about the Manager Defendants' rental rates or whether they rose at all, much less to supra-competitive levels in a coordinated fashion. There are no facts alleging that the Manager Defendants compete for the same tenants. Similarly, Plaintiffs fail to allege a plausible relevant product or geographic market or that the Manager Defendants possess "market power." The elements of an antitrust conspiracy are wholly absent.

**The FAC undermines its own price-fixing allegations.** Plaintiffs repeatedly cite contradictory materials acknowledging that Yardi's revenue management customers make independent pricing decisions. The software is "configurable" by users who have "control" over pricing with "adjustable pricing metrics," and users can ignore the price recommendations. *See, e.g.*, FAC ¶ 60; ¶ 69 n.11 (citing Revenue IQ brochure); ¶ 74 n.15 (citing Revenue IQ brochure).[2] The lack of any allegation that the Manager Defendants agreed to configure the software the same way further dooms the plausibility of any conspiracy. Moreover, the FAC recognizes many reasons why property managers would independently decide to use Revenue IQ consistent with rational and competitive business behavior, including generating higher occupancy rates and income, accessing more sophisticated analytics and lease management tools, and obtaining comprehensive reporting.

**Revenue IQ use alone cannot sustain a price-fixing conspiracy.** The FAC boils down to the novel claim that mere use of Yardi's revenue management product transforms the user into an antitrust cartel member. That is neither the law nor plausible. Indeed, the District of Nevada recently dismissed with prejudice a complaint premised on a similar "relatively novel antitrust theory . . . going in search of factual allegations that could

---

[2]  *See* Request for Judicial Notice (hereinafter "RJN") Ex. 1; *id.*, Ex. 2.

DEFENDANTS' OMNIBUS MOTION TO DISMISS

1  support it." *Gibson v. Cendyn Grp., LLC*, 2024 WL 2060260 (D. Nev. May 8, 2024)

2  (*Gibson II*). The same holds true here. Plaintiffs have filed a pleading based on speculation

3  alone. Rule 12 is designed to weed out cases just like this one, and the FAC should be

4  dismissed with prejudice.[3]

5                              **BACKGROUND**[4]

6  **I.    Yardi's revenue management product**

7          Yardi licenses property management software to owners and managers of

8  multifamily residential units. FAC ¶ 32.[5] Among Yardi's products is revenue management

9  software called Revenue IQ, which was introduced in 2011 for optional use with Yardi's

10  property management platform. *Id.* ¶ 57. Revenue IQ helps property managers simplify

11  rental pricing by transparently analyzing trends of supply, demand, and market conditions

12  together with property managers' individual goals and priorities. *Id.* ¶ 85 n.26 (citing article

13  (RJN Ex. 3)); ¶ 91 n.32 (citing article (RJN Ex. 4)). Revenue IQ users input their own data,

14  including rental prices, unit type, and occupancy status. *Id.* ¶ 59. The software is

15  "configurable" by the user and offers "flexible" pricing that users "control with adjustable

16  pricing metrics to achieve [their] goals." *Id.* ¶ 69 n.11 (citing Revenue IQ brochure).[6]

17  Multiple pricing options and lease terms fit client needs and address fair housing concerns.

18  *Id.* ¶ 72 n.12 (citing Revenue IQ brochure (RJN Ex. 6)).

19          Revenue IQ suggests rental rates daily based on market conditions and changes in a

20

21  [3]  Based on the Complaint, Defendants informed Plaintiffs' counsel that the buildings from which their two putative class representatives rented apartments did not use Revenue IQ. The FAC contains the same critical flaw—none of the five plaintiffs lived in a building using Revenue IQ. With this repeated infirmity, and given the fundamental implausibility of their claims, Plaintiffs should not receive a third attempt to state claim.

22

23

24  [4]  Unless otherwise noted, all emphasis is added, all citations, brackets, original alterations, and internal quotation marks are omitted from all quoted material for readability, and subsequent history is included only in the Table of Authorities.

25  [5]  The FAC's factual allegations are accepted as true solely for purposes of this motion, except to the extent they are contradicted by documents cited in the FAC or documents of which the Court may take judicial notice. *See Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

26

27  [6]  RJN Ex. 1; *see also* FAC ¶ 13 n.2 (RJN, Ex. 5) (stating Revenue IQ "empowers our leasing agents with multiple pricing options, which makes negotiations with prospects much more engaging and successful").

28

DEFENDANTS' OMNIBUS MOTION TO DISMISS

property's inventory and traffic, while adjusting for cost constraints such as vacancy loss, turnover costs, and inventory hold days. *Id*. ¶ 75. Importantly, Revenue IQ users are free to reject or override the suggested rents. *Id*. ¶ 61. Revenue IQ also facilitates lease expiration management and offering discounts to fill stale units, leading to increased occupancy levels. *Id*. ¶ 85 n.26 (citing article (RJN Ex. 3)); ¶ 87 n.28 (citing article (RJN Ex. 7)). Yardi revenue managers meet regularly with customers, get to know their business, and assist them in configuring Revenue IQ to meet each building's unique goals. *Id*. ¶ 78 n.17 (citing article (RJN Ex.6)).

## II.    The Manager Defendants

Each Manager Defendant allegedly "provides apartment management services" and "entered into a contract with Yardi." FAC ¶¶ 33–46. Notably, the FAC fails to identify when these contracts with Yardi were executed, which Yardi products were included in these contracts, how many properties each Manager Defendant manages, where those properties are located, any information about their rental rates, or which of their properties (if any) licensed Revenue IQ. The FAC merely gives the location of each Manager Defendant's corporate headquarters and vaguely asserts that some are among the "largest Landlord[s] in the United States" with properties in "multiple markets across the country." *Id*. ¶¶ 33–46, 109. The FAC lacks facts establishing that any tenants choose among properties managed by the Manager Defendants or that the Manager Defendants compete for the same tenants. There simply is no basis to believe that the Manager Defendants would or could conspire with one another to inflate rents.

## III.    The alleged conspiracy

Plaintiffs ask this Court to assume that at an unidentified time and place, Defendants allegedly devised a "strategy to enable collusive pricing" through Revenue IQ in unspecified "Apartment Markets" in order to "eliminate[] price competition and maximize[] revenues." FAC ¶¶ 54, 57, 108. The FAC asserts the same boilerplate allegation for each Manager Defendant, *i.e.*, each "outsource[ed] [its] pricing decisions to Yardi rather than setting lease prices independently" and "provided to Yardi its

DEFENDANTS' OMNIBUS MOTION TO DISMISS

competitively sensitive pricing information and the information of other Property Managers . . . knowing that Yardi would use that data to set lease prices for" itself and its competitors. *Id.* ¶¶ 33–46. Each Manager Defendant's leases in the unidentified "Apartment Markets" allegedly were priced "higher than the rates [it] would have set had [it] priced the leases unilaterally . . . ." *Id.* ¶¶ 59–60.

Plaintiffs' conclusory allegations are squarely undercut by their own cited materials and more specific allegations elsewhere in the FAC.

## IV.  Plaintiffs' causes of action

Plaintiffs each allegedly lease apartments in buildings that are or were managed by one of three Manager Defendants. *See* FAC ¶ 27 (Plaintiff Frank from RAM Partners in Peachtree Corners, Georgia); ¶ 28 (Plaintiff Nagireddi from Greystar in Anaheim, California); ¶ 29 (Plaintiff Yeckley from Essex in Los Angeles, California); ¶ 30 (Plaintiff Miles from Greystar, in Hercules, California); ¶ 31 (Plaintiff Yashar from Essex in San Francisco, California).

The FAC does not allege that Defendants set any of Plaintiffs' rents using Revenue IQ nor any other details about Plaintiffs or their leases. It merely alleges that each paid "higher lease prices" for their living spaces because of Defendants' alleged "conduct." *Id.* ¶¶ 27–31. Plaintiffs bring two claims under the Sherman Act, 15 U.S.C. § 1, *et seq*. Claim 1 alleges that Defendants conspired to unlawfully fix prices in unspecified "Apartment Markets," a *per se* violation. FAC ¶¶ 133–34. Claim 2 alleges that Defendants "entered into an unlawful price-fixing agreement," the purpose and effect of which was to restrain competition in the unidentified markets, an unreasonable restraint of trade under the rule of reason. *Id.* ¶¶ 139–140.

## ARGUMENT

Plaintiffs' claims fail as a matter of law and should be dismissed for five reasons. *First*, Plaintiffs lack Article III and antitrust standing because their apartments were not priced using Yardi's software, and thus could not have been injured by the purported conspiracy. This is all the Court needs to consider to dismiss Plaintiffs' action, but there

13

are other independently dispositive reasons why Plaintiffs' claims must fail. *Second*, Plaintiffs fail to allege an essential element of a price-fixing scheme—an agreement. The FAC fails to allege that the Manager Defendants agreed with each other to do anything. *Third*, Plaintiffs fail to allege parallel conduct that might circumstantially implicate Defendants in a conspiracy or "plus factors" to support such allegations. *Fourth*, even if Plaintiffs alleged an unlawful agreement, *per se* treatment would not apply to Claim 1. Plaintiffs' claims would need to be analyzed under the rule of reason. *Fifth*, Plaintiffs' claims all fail under the rule of reason.

Indeed, the FAC amounts to an improper "shotgun style" pleading, grouping the Manager Defendants together and making identical assertions that each contracted with Yardi and liability must necessarily flow from there. The FAC does not plausibly allege *any* agreement among the Manager Defendants, *any* agreement between the Manager Defendants and Yardi to control pricing, *any* relevant product or geographic market, or that the Manager Defendants possess market power in *any* market. In sum, Plaintiffs fail to allege any factual support for a conspiracy, much less a conspiracy that purportedly involved 15 companies and spanned the country.

The FAC fails to plead plausible Sherman Act claims and should be dismissed.

## I.   Plaintiffs lack standing

Plaintiffs' claims rest entirely on the Manager Defendants' purported use of Revenue IQ to fix prices. *See e.g.*, FAC ¶¶ 6, 58–62, 67. Plaintiffs allege that Revenue IQ enables the Manager Defendants to give Yardi confidential data, "outsource" price management to Yardi, and agree with each other to forego price competition. *Id*. ¶¶ 58–62. But Plaintiffs did not live in buildings that used Revenue IQ, and so could not have been harmed by this alleged conduct. Plaintiffs lack Article III and antitrust standing, requiring dismissal.

Article III limits federal courts to adjudicating actual cases and controversies. *Allen v. Wright*, 468 U.S. 737, 750 (1984). Standing under Article III is a threshold inquiry, since "[w]ithout jurisdiction the court cannot proceed at all in any cause." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94–95 (1998) (explaining that this gatekeeping function

"spring[s] from the nature and limits of the judicial power of the United States" and is "inflexible and without exception"). Accordingly, district courts may consider extrinsic evidence on a factual challenge to subject matter jurisdiction. *See Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) ("In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint" and "need not presume the truthfulness of the plaintiff's allegations."); *see also Dalfio v. Orlansky-Wax, LLC*, 2022 WL 3083323, at *1 (9th Cir. Aug. 3, 2022) ("A district court may properly consider extrinsic evidence on a 'factual' motion to dismiss under Rule 12(b)(1).").

To establish Article III standing, Plaintiffs must adequately allege that (*i*) they suffered an injury in fact that is concrete and particularized; (*ii*) the alleged injury is fairly traceable to Defendants' conduct, which means alleging a substantial probability that Defendants caused the alleged injury; and (*iii*) the alleged injury would likely be redressed by judicial relief. *See TransUnion LLC v. Ramirez*, 594 U.S. 413, 423–24 (2021); *Winsor v. Sequoia Benefits & Ins. Servs., LLC*, 62 F. 4th 517, 525 (9th Cir. 2023). An "injury in fact" must be concrete, particularized, and actual or imminent, rather than conjectural or hypothetical. *Lujan v. Defs. of Wildlife*, 504 U.S. 555 (1992); *Summers v. Earth Island Inst.*, 555 U.S. 488, 493 (2009) (finding that a plaintiff must "allege such a personal stake in the outcome of the controversy as to warrant his invocation of federal-court jurisdiction"). A plaintiff who seeks to represent a class cannot meet the injury-in-fact requirement merely by alleging that other unidentified members of the putative class have suffered an injury. *See Blum v. Yaretsky*, 457 U.S. 991, 999 (1982).

The "more demanding" antitrust standing doctrine requires a sufficiently direct injury. *Lucas Auto. Eng'g, Inc. v. Bridgestone/Firestone, Inc.*, 140 F.3d 1228, 1232 (9th Cir. 1998); *see also Gerlinger v. Amazon.com Inc.*, 526 F.3d 1253, 1255 (9th Cir. 2008) (describing the antitrust standing inquiry as "distinct" from Article III). Plaintiffs must plead an injury that "flows from that which makes the conduct unlawful" and "is of the type the antitrust laws were intended to prevent." *Reveal Chat Holdco, LLC v. Facebook, Inc.*, 471 F. Supp. 3d 981, 997 (N.D. Cal. 2020). Otherwise, "an essential element of the

15

plaintiff's case is missing and the plaintiff's case fails." *R.C. Dick Geothermal Corp. v. Thermogenics, Inc*., 890 F.2d 139, 145 (9th Cir. 1989).

Plaintiffs allege that they were harmed by a horizontal conspiracy among the Manager Defendants to charge tenants above-market rates by adopting prices suggested by Revenue IQ. *See, e.g*., *id*. ¶¶ 5, 9; *see also id*. ¶ 16 ("[I]instead of each Property Manager competing for tenants by setting its own rental rates, a single entity—Yardi—manages rates for all its Property Manager customers."); ¶ 18 (the Manager Defendants allegedly "impos[ed] on tenants the Yardi-managed lease prices"). Plaintiffs unequivocally allege in the FAC that Yardi manages lease pricing through Revenue IQ. However, <u>Plaintiffs do not allege that the buildings where they leased apartments ever licensed or used Revenue IQ</u>. Because Plaintiffs fail to allege that their rental rates were "managed" or "imposed" by Yardi, they fail to allege an injury fairly traceable to the use of Revenue IQ.

Nor could they make such an allegation, because the indisputable facts demonstrate that their apartment buildings never licensed or used Revenue IQ. In September 2023, Defendant RAM began managing a property located at 3352 Chelsea Park Lane, Peachtree Corners, GA ("3352 Chelsea Park Lane property"). *See* Declaration of Grant Rice ("Rice Decl."), attached as Exhibit A, ¶ 3. Plaintiff Daniel Frank holds a lease agreement for a unit at the 3352 Chelsea Park Lane property. *Id*. ¶ 4–8 (reflecting lease agreements beginning February 6, 2023, and running through October 31, 2024). RAM has never utilized, subscribed to, or licensed Revenue IQ, nor any other rental pricing software or algorithm produced by Yardi, to calculate or recommend rents for any unit at this property. *Id*. ¶ 10. Yardi's records confirm that Revenue IQ was never used at the 3352 Chelsea Park Lane property, either by RAM or any other manager. *See* Declaration of Michael Gaeta ("Gaeta Decl."), attached as Exhibit B, ¶ 7.

Defendant Greystar has managed a property located at 1818 S. State College Blvd., Anaheim, CA, since October 2021 ("1818 Platinum Triangle property"). *See* Declaration of Bradley Johnson, attached as Exhibit C, ¶ 3. Plaintiff Lakshmi Nagireddi holds a lease agreement for a unit at the 1818 Platinum Triangle property. *Id*. ¶ 5–8 (reflecting lease

DEFENDANTS' OMNIBUS MOTION TO DISMISS

agreements beginning February 23, 2020, and running through November 30, 2024). Greystar has never utilized, subscribed to, or licensed Revenue IQ, nor any other rental pricing software or algorithm produced by Yardi, to calculate or recommend rents for any unit at this property. *Id*. ¶ 9–10. Yardi's records confirm that Revenue IQ was never used at the 1818 Platinum Triangle property, either by Greystar or any other manager. Gaeta Decl. ¶ 8.

Greystar also managed a property located at 2200 John Muir Parkway, Hercules, California, between July 2021 and July 2024 ("The Grand property"). Johnson Decl. ¶¶ 11, 14. Plaintiff Sherrie Miles holds a lease agreement for a unit at The Grand property. *Id.* ¶¶ 12-12 (reflecting lease agreements beginning September 27, 2022 and running through September 27, 2024). Greystar never utilized, subscribed to, or licensed Revenue IQ, nor any other rental pricing software or algorithm produced by Yardi, to calculate or recommend rents for any unit at The Grand property. *Id*. ¶ 15. Yardi's records confirm that Revenue IQ was never used at The Grand property, either by Greystar or any other manager. Gaeta Decl. ¶ 9.

Defendant Essex has managed a property located at 733 N. Kings Road, Los Angeles, CA, since 1997 ("The Blake L.A. property"). *See* Declaration of Scott Spicer ("Spicer Decl."), attached as Exhibit D, ¶ 3. Plaintiff Eric Yeckley holds a lease agreement for a unit at The Blake L.A. property. *Id.* ¶ 3 (reflecting a lease agreement dated approximately July 23, 2020); *see also* FAC ¶ 29. Essex has never utilized, subscribed to, or licensed Revenue IQ, nor any other rental pricing software or algorithm produced by Yardi, to calculate or recommend rents for any unit at The Blake L.A. property. Spicer Decl. ¶ 4; Gaeta Decl. ¶ 10. In fact, Essex has never subscribed to or licensed Revenue IQ to set prices for any of its properties. Spicer Decl. ¶ 10.

Essex has also managed a property located at 1390 Market Street, San Francisco, CA, since 2013 ("Fox Plaza property"). Spicer Decl. ¶ 5. Plaintiff Heather Yashar holds a lease agreement for a unit at the Fox Plaza property. *Id*. ¶ 6 (reflecting a lease agreement dated June 5, 2020); *see also* FAC ¶ 31. Essex has never utilized, subscribed to, or licensed

Revenue IQ, nor any other rental pricing software or algorithm produced by Yardi, to calculate or recommend rents for any unit the Fox Plaza property. Spicer Decl. ¶ 7; Gaeta Decl. ¶ 11.

Plaintiffs could not have suffered any injury-in-fact fairly traceable to the alleged conspiracy because Revenue IQ—the supposed tool of the conspiracy—was not used to price their apartments. Their claims should be dismissed for lack of Article III standing. Even were this not dispositive, Plaintiffs also lack antitrust standing. They fail to identify the specifics of the rent they paid, fail to allege a pervasive price-fixing conspiracy that infected the entire market, and fail to allege a connection between Defendants' supposedly unlawful conduct and the rents they paid. *See Okl. Firefighters v. Deutsche Bank*, 2024 WL 4202680, at *12 (S.D.N.Y. Sept. 13, 2024) ("[B]ecause the complaint does not set out the details of the plaintiff's specific trades, 'let alone a connection between [the] [d]efendants' unlawful conduct and that non-injury,' it fails to allege any plausible episodic antitrust injury.").

## II. The FAC fails to allege an unlawful agreement

To plead a *prima facie* Section 1 claim, Plaintiffs must allege "evidentiary facts which, if true, will prove: (1) a contract, combination or conspiracy among two or more persons or distinct business entities; (2) by which the persons or entities intended to harm or restrain trade or commerce . . . ; (3) which actually injures competition" in a relevant market. *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008).

Section 1 prohibits agreements to restrain trade; it does not reach unilateral conduct or independent decision-making. *See Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 553–54 (2007). Thus, the "crucial question" is whether the challenged conduct "stem[s] from independent decision or from an agreement." *Id.* at 553; *see also Ashcroft v. Iqbal*, 556 U.S. 662, 680 (2009) (explaining that a plaintiff must allege facts to "plausibly suggest an unlawful agreement," as opposed to conduct equally consistent with rational, unilateral behavior). In a hub-and-spoke conspiracy such as the one alleged here, with Yardi as the purported hub and Manager Defendants as spokes, the "critical issue . . . is how the spokes

DEFENDANTS' OMNIBUS MOTION TO DISMISS

are connected to each other." *Total Benefits Plan. Agency, Inc. v. Anthem Blue Cross & Blue Shield*, 552 F.3d 430, 436 (6th Cir. 2008); *see also In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186, 1193 (9th Cir. 2015) (noting a claim "depends on establishing those horizontal agreements"). An antitrust claim also must be plausible "in light of basic economic principles." *William O. Gilley Enters., Inc. v. Atl. Richfield Co.*, 588 F.3d 659, 662 (9th Cir. 2009); *see also PSKS, Inc. v. Leegin Creative Leather Prods., Inc.*, 615 F.3d 412, 419 (5th Cir. 2010) (affirming dismissal of Section 1 claim that "defie[d] the basic laws of economics").

Plaintiffs fail to allege the essential requirement for a horizontal price-fixing claim—an agreement among competitors. *See Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 976 (9th Cir. 2008) (explaining that *per se* unlawful conspiracies require an agreement among competitors). The lawsuit hypothesizes that the Manager Defendants agreed to license Revenue IQ and adopt its pricing suggestions to drive up multifamily apartment rents. But fatally absent are any allegations that the purported "competitors" agreed with each other to do anything. The FAC does not allege a single fact that could establish direct or circumstantial evidence of an agreement to fix rents in *any* market. A mere allegation that companies license the same product does not come close to plausibly pleading a price-fixing claim.

## A.    Plaintiffs fail to allege direct evidence of an agreement

Direct evidence is "smoking-gun evidence that 'establishes, without requiring any inferences' the existence of a conspiracy." *Honey Bum, LLC v. Fashion Nova, Inc.*, 63 F.4th 813, 822 (9th Cir. 2023). Such evidence "usually take[s] the form of an admission by an employee of one of the co-conspirators, that officials of the defendants had met and agreed explicitly on the terms of a conspiracy." *In re Text Messaging Antitrust Litig.*, 630 F.3d 622, 628 (7th Cir. 2010).[7] No such admissions or direct evidence are alleged here.

---

[7]    *See also Real Est. Exch., Inc. v. Zillow, Inc.*, 2023 WL 5278115, at *6 (W.D. Wash. Aug. 16, 2023) ("[Direct evidence] may consist of written documents, audio or video recordings, or eyewitness testimony about what was said.").

DEFENDANTS' OMNIBUS MOTION TO DISMISS

**(1)    No allegations of who, did what, to whom, where, and when?**

Far from alleging smoking gun evidence, Plaintiffs fail to allege the basic elements of an antitrust conspiracy. It is not enough for Plaintiffs to plead "just ultimate facts (such as a conspiracy)." *Kendall*, 518 F.3d at 1047. Rather, Plaintiffs must show how the spokes fit together by pleading "evidentiary facts" that establish each defendant's participation in the alleged conspiracy: "who, did what, to whom (or with whom), where, and when?" *See id.* (explaining that "facts such as a 'specific time, place, or person involved in the alleged conspiracies' [] give a defendant . . . an idea of where to begin").

Plaintiffs allege zero facts about what role any of the Manager Defendants played in the alleged conspiracy. Plaintiffs instead resort to "shotgun" pleading, lumping the Manager Defendants together and making identical boilerplate assertions that each "entered into a contract" with Yardi.  Not a single fact is alleged as to who, did what, to whom, where, and when. Instead, the FAC alleges only that each entered into a contract "by which it joined with other Yardi client property managers to collude on lease pricing." *See, e.g.*, FAC ¶ 33. Plaintiffs fail to identify any individual who communicated with another Manager Defendant, much less facts establishing what they agreed to or how the conspiracy would operate. Plaintiffs do not allege when each of the Manager Defendants joined the purported conspiracy or which, if any, of their properties used Revenue IQ. These threadbare allegations do not suffice. *See Kendall*, 518 F.3d at 1047 (finding bare allegation that banks conspired was insufficient because banks "are large institutions with hundreds of employees entering into contracts and agreements daily"); *Total Benefits,* 552 F.3d at 436 (affirming dismissal where complaint failed to allege "when Defendants joined the . . . conspiracy, where or how this was accomplished, and by whom or for what purpose"); *Gibson I*, 2023 WL 7025996, at *3–4 (finding conspiracy implausible in part because plaintiff did "not say who entered into the purported agreement to use the same pricing algorithms beyond 'Hotel Operators'" and the court "cannot plausibly infer that all Hotel Operators began using particular pricing software at or around the same time" where

DEFENDANTS' OMNIBUS MOTION TO DISMISS

plaintiff failed to allege when the conspiracy began); *Bay Area Surgical Mgmt. LLC v. Aetna Life Ins. Co.*, 166 F. Supp. 3d 988, 995 (N.D. Cal. 2015) (alleging simply that insurance companies conspired "is not a sufficient allegation of the 'who'" because insurers "are large organizations").

Plaintiffs allege only the locations of the Manager Defendants' headquarters and that each contracted with Yardi at some unspecified time. FAC ¶¶ 34–46. For example, Plaintiffs allege that Avenue5 is headquartered in Seattle, "provides apartment management services," "is a client of Yardi," and "is the tenth largest Property Manager in the United States." Compl. ¶ 38. Plaintiffs allege that 10 Federal is headquartered in Raleigh, North Carolina, and "has provided apartment management services and has been a client of Yardi." *Id.* ¶ 39. There is no way, based on these allegations, to infer that Avenue5 and 10 Federal are competitors, entered into an agreement to inflate rents in some unidentified "Apartment Market," or even licensed Revenue IQ at any property within that supposed market. *Gibson I*, 2023 WL 7026984, at *3 (dismissing MGM because "[p]laintiffs do not plausibly allege that any MGM hotels within Plaintiffs' defined market of the Las Vegas Strip used the Rainmaker software."). The allegations regarding the other Manager Defendants are just as sparse.

Simply listing 14 property management companies and claiming each one contracted with Yardi, which provides many different software solutions, only one of which recommends rents, does not satisfy Plaintiffs' pleading burden. *See Kendall*, 518 F.3d at 1047–48 (explaining that an antitrust plaintiff must plead "evidentiary facts" establishing the defendants' participation in the conspiracy); *Bona Fide Conglomerate, Inc. v. SourceAmerica*, 691 F. App'x 389, 390 (9th Cir. 2017) (affirming dismissal for "fail[ure] to allege sufficient facts" that would answer the "basic questions" of "who, did what, to whom (or with whom), where, and when?"). Plaintiffs' claims must therefore be dismissed.

### (2) No agreement to configure software the same way or to abide by rent recommendations

Similarly, Plaintiffs fail to plausibly allege the substance of any agreement. They baldly assert that the Manager Defendants "outsource" pricing to Yardi. FAC ¶ 62. But the FAC is devoid of any allegation that the Manager Defendants authorized Yardi to act for them, let alone facts suggesting they abdicated their independent decision-making. *See Gibson II*, 2024 WL 2060260, at *6 ("Hotel Defendants . . . allegedly 'delegated' their decisionmaking on price to Cendyn—but . . . Plaintiffs have not alleged that Hotel Defendants have given Cendyn authority to act.").

Plaintiffs point to an innocuous statement in a Revenue IQ brochure saying, "You manage your business, we manage your pricing," and an unsourced quote stating that Revenue IQ "prices new and renewal leases using the balance between real-time inventory, traffic and market conditions." *Id.* ¶¶ 10, 12, 79. These quotes do not plausibly suggest that the Manager Defendants or anyone else outsources their pricing to Yardi's Revenue IQ. They merely reflect the function of revenue management software, which is to digest a property manager's data—traditionally was done manually—and analyze it more accurately and efficiently. *See, e.g.*, *id.* ¶ 81 (quoting user stating "site managers no longer have to manually figure out competitive rents"); *see also Gibson II*, 2024 WL 2060260, at *3 (explaining that revenue management products "merely make recommendations").

Moreover, the FAC cites materials that describe the revenue management software as "configurable" by users who can "[a]djust pricing metrics to achieve your revenue goals," offers "flexible pricing" and "pricing control" with "multiple options to meet customer needs and fair housing requirements," provides "unique transparency and control," and allows users to "decide what controls and comps to apply and maintain the flexibility to respond quickly to changing market conditions." *Id.* ¶ 69 n.11 (citing brochure); ¶ 83 n.25 (citing video); ¶ 88 n.29 (citing press release).[8] Notably, Plaintiffs do

---

[8] RJN Ex. 1; *id.*, Ex. 8; *id.*, Ex. 9.

not allege that the Manager Defendants agreed to configure the software the same way or otherwise implement the same pricing formula. Plaintiffs fail to allege any evidence of an agreement to delegate pricing decisions to Yardi.

Equally deficient is the allegation that Yardi Revenue Managers "ensure that Landlords use Yardi's 'recommended' prices and make the price increases stick despite pushback from tenants." FAC ¶ 81. As an initial matter, this allegation simply suggests that users indeed retain authority to override the software's recommended prices. *See also id.* ¶ 63. User choice and independent decision-making are the antithesis of an antitrust conspiracy. Further, Plaintiffs allege no facts to substantiate the allegation that Revenue Managers "help[] perfect price collusion." *Id.* Plaintiffs purport to cite a Yardi brochure that purportedly says Revenue Managers "control pricing at the property level." *Id.* ¶ 80. However, *no such language appears in the brochure*. *Id.* ¶ 78, n.17 (to which ¶ 80 cites (RJN Ex. 6)). Plaintiffs also cite innocuous statements by a few non-defendant property managers, such as that Revenue Managers provide "analysis and input on how we are pricing our properties relative to our markets and business goals" and "can dig deeper to support our pricing." *Id.* ¶¶ 81–82. Such comments do not plausibly suggest Revenue Managers enforce a price-fixing scheme as opposed to assisting clients' use of Revenue IQ.

Plaintiffs' failure to plausibly allege that the Manager Defendants agreed to abide by Revenue IQ's prices, or even to identify any rates of acceptance among the Manager Defendants, let alone similar adoption rates, is fatal to their claims. *Gibson II*, 2024 WL 2060260, at *8 (explaining that plaintiffs' failure to allege the price recommendations were binding underscored the lack of a tacit agreement to fix prices).

### (3)    No agreement to exchange confidential pricing data

Plaintiffs further assert that each Manager Defendant agreed to give Yardi its *own* "sensitive competitive pricing and supply data"—an obvious and entirely lawful prerequisite to receiving individual property-level pricing recommendations for its own properties. FAC ¶¶ 6, 7, 72. Plaintiffs then make a speculative leap that each Manager Defendant somehow "knows" that Yardi purportedly compiles customers' confidential,

non-public data and uses it to set prices for competing Property Managers. *Id.* ¶¶ 33–46, 57, 59, 102. But Plaintiffs fail to allege any facts to support the claim that Yardi commingles confidential, non-public data at all.[9] *Gibson II*, 2024 WL 2060260, at *5 (Plaintiffs' failure to plausibly allege the exchange of confidential information from one of the spokes to the other through the hub's algorithms is another fatal defect with their first claim because it too compels the conclusion that there is no rim.").[10]

Plaintiffs again rely on innocuous language from Yardi marketing materials. For instance, they cite a statement that "[w]ith this transparent system you will see everything from rental rates and occupancy data to property performance benchmarking (compared to the market, submarket and competition)." *Id.* ¶ 72. But the cited brochure makes clear that "rental rates and occupancy data" refers to the user's *own data. Id.* ¶ 72 n.12 ("Designed to optimize revenue by pricing leases using the balance between your real-time inventory, traffic and market conditions from Yardi Matrix, RENTmaximizer provides complete visibility into your rent movement and your financial and operational performance.").[11] Other alleged statements include "to stay competitive in the market you must have a thorough understanding of what your Competitors are offering," *id.* ¶ 67, and that with benchmarking data, "you can accurately benchmark performance and factor it into rent projections and calculations which enhances your revenue management strategy and helps boost the performance of individual assets." *Id.* ¶ 78. Notably, none of these miscellaneous quotes says anything about how *Revenue IQ generates rental rate recommendations*, much less "plausibly suggest that one customer has access to the confidential information of another customer." *Gibson II*, 2024 WL 2060260, at *5 (finding "conclusory" allegation based on statement "we used data across all our customers for research" did not plausibly

---

[9]  Nor could they, because that is not how Revenue IQ has ever worked. Yardi informed Plaintiffs that the confidential information-pooling were false and provided verified interrogatory responses. Although factual disputes are not at issue for this motion, it is notable that Plaintiffs have failed to provide any basis for their allegations in response.

[10]  A state court applying state law in a case against Yardi, *Mach, et al. v. Yardi Systems, Inc., et al.*, No. 24-CV-063117 (Cal. Super. Ct.), erroneously credited the type of vague allegations that Chief Judge Du rejected in *Gibson I*.

[11]  RJN, Ex. 6.

DEFENDANTS' OMNIBUS MOTION TO DISMISS

suggest users "exchange confidential or proprietary information with each other").

Nor is there any basis to draw an inference that pricing recommendations are based on confidential competitor data. Information on comparative rental rates is available, including to all prospective renters, from numerous *public* sources, including property manager websites and online sites such as Rent.com or Zillow. *See* RJN ¶ 16. "There is nothing unreasonable about consulting public sources to determine how to price your product." *Gibson II*, 2024 WL 2060260, at *5; *see also Gibson I*, 2023 WL 7025996, at *5 (dismissing complaint and noting "[p]ublic pricing data is available from hotel websites, Expedia, and the like—that could be the information 'shopped' back to a client").[12]

For each of these independently sufficient reasons, Plaintiffs' conclusory allegations fail to plausibly allege direct evidence of a price-fixing agreement. A "bare assertion of conspiracy . . . will not suffice." *Twombly*, 550 U.S. at 556; *see also Gibson II*, 2024 WL 2060260, at *8 (dismissing complaint with prejudice and citing lack of "specific, nonconclusory allegations in the FAC that Hotel Defendants ever agreed to fix prices").

### B.    Plaintiffs fail to allege circumstantial evidence of an agreement

Absent direct evidence, Plaintiffs must plausibly plead circumstantial evidence of an unlawful agreement. This means facts showing both (1) "parallel conduct" by each Defendant and (2) "plus factors" to support those allegations. *In re Musical Instruments*, 798 F.3d at 1193–94. The FAC fails on both counts.

#### (1)    No parallel conduct

Parallel conduct may consist of "competitors adopting *similar* policies around the same time in response to *similar* market conditions . . . ." *In re Musical Instruments*, 798 F.3d at 1193. Plaintiffs fail to articulate any theory of parallel conduct.

As an initial matter, the FAC is silent as to when each Manager Defendant purportedly began using Revenue IQ. Instead, Plaintiffs repeat the boilerplate allegation

---

[12] *See also Prosterman v. Am. Airlines, Inc.*, 747 F. App'x 458, 462 (9th Cir. 2018) (rejecting claim premised on pricing information clearinghouse that made published fares available to industry).

that each Manager Defendant "entered a contract with Yardi" at some unspecified time in the 13–plus years since Revenue IQ was introduced. *Id*. ¶¶ 57, 33–46. A lack of temporal proximity undermines an allegation of parallel conduct. *See In re Musical Instruments,* 798 F.3d at 1196 ("[T]he manufacturer defendants adopted the policies over a period of several years, not simultaneously. Allegations of such slow adoption of similar policies does not raise the specter of collusion."); *Gibson II*, 2024 WL 2060260, at *4 (finding allegation that defendant hotels "began licensing [revenue management software] at different times over an approximately 10-year period . . . . suggest a tacit agreement between them is implausible"). Plaintiffs offer no other viable allegations of parallel conduct, such as parallel pricing or supply reductions, to support their claims.

*No plausible allegation of parallel pricing*. Plaintiffs vaguely suggest that "rental prices have increased" or have been "artificially raised." FAC ¶¶ 3, 13. But the FAC says nothing about the Manager Defendants' actual rental rates. Plaintiffs do not allege what rents they charged, whether or when those rates changed, or what they changed to.[13] Even if there were such allegations, increasing one's prices in response to market conditions is entirely rational economic behavior. *See Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp*., 509 U.S. 209, 237 (1993) (explaining that raising prices does not alone "permit a rational inference of conscious parallelism or supracompetitive pricing" because it may be "equally consistent with growing product demand"); *In re RealPage, Inc., Rental Software Antitrust Litig. (No. II)*, 709 F. Supp. 3d 478, 509 (M.D. Tenn. 2023) (finding allegation that "rent prices increased between 2013 and 2023" did not "indicate any plausible conspiracy").

The FAC is equally bereft of facts suggesting that the Manager Defendants raised their rents in a coordinated fashion or that their pricing had any anticompetitive impact on market rates. Absent such allegations, there are no plausible grounds to infer that the Manager Defendants engaged in parallel pricing in furtherance of a price-fixing

---

[13] At most, Plaintiffs suggest that *one* Manager Defendant increased rent revenue (not prices) *while increasing occupancy* back in 2015. *Id*. ¶ 89 n.30. (RJN, Ex. 10).

DEFENDANTS' OMNIBUS MOTION TO DISMISS

conspiracy. *See Jacobs v. Tempur-Pedic Int'l, Inc*., 626 F.3d 1327, 1343 (11th Cir. 2010) (finding conspiracy implausible where there was "no indication, for example, of dates on which distributors moved prices together, or the amounts by which the prices moved, if in fact they did"); *In re Elevator Antitrust Litig*., 502 F.3d 47, 52 (2d Cir. 2007) (affirming dismissal of complaint alleging conspiracy to fix elevator prices where there were "no allegations of the actual pricing of elevators . . . in the United States or changes therein attributable to defendants' alleged misconduct").

Plaintiffs cannot overcome this pleading deficit by pointing to a 2017 Yardi promotional video stating that Revenue IQ users "gained on average over 6% net rental income growth per year while maintaining or improving occupancy." FAC ¶ 83 n.25 (RJN Ex. 8). *First*, allegations based on a purported average over seven years ago says nothing about the *Manager Defendants'* rental rates, let alone during the putative class period of September 2019 to the present. *Cf. In re Musical Instruments*, 798 F.3d at 1197, 1197 n.12 (rejecting analysis suggesting increase in "average retail price" of all goods sold in the relevant market, instead of increase in price of goods "manufactured by defendants," noting "[a]s far as we can tell . . . retail prices of defendants' products actually might have fallen during the class period. . . ."); *Gibson I*, 2023 WL 7025996, at *3 (rejecting reliance on average acceptance rates across software's customers because that "allegation does not speak to the acceptance rate of the hotels on the Las Vegas Strip")..[14] *Second*, the statement refers to *net rental income growth*, not rental *rates*, and the video explains that "smart revenue management is about balancing unit supply and renter demand to optimize revenue, not just raising rents." FAC ¶ 83 n.25 (RJN, Ex. 8). The FAC elsewhere acknowledges that revenue is driven by multiple factors other than rental rates, including higher occupancy levels and longer lease terms. *Id*. ¶ 74 n.15 (quoting brochure explaining operational components driving revenue include "rental income, concessions, occupancy and rental rate, not just pricing" (RJN, Ex. 2)). In sum, this statement cannot plausibly be

---

[14] *See In re Pork Antitrust Litig.*, 2019 WL 3752497, at *8 (D. Minn. Aug. 8, 2019) (refusing to draw individual inferences about defendants based on industry-wide data).

DEFENDANTS' OMNIBUS MOTION TO DISMISS

construed as evidence that Defendants engaged in a supracompetitive pricing scheme.

***No plausible allegation of a parallel pricing strategy***. Plaintiffs also attempt to allege that Revenue IQ has somehow resulted in leases of shorter duration, citing one non-defendant stating it "confidently offer[s]" short-term leases and Labor Bureau statistics suggesting that between January and June 2022, less than 9% of leases were longer than one year. FAC ¶ 96, 98. From this, Plaintiffs leap to the conclusion that "Yardi-based price collusion has made short-term leases ubiquitous in Apartment Markets around the country." *Id.* ¶ 100. Setting aside the gaping holes in Plaintiffs' logic and evidence, these allegations say nothing about *the Manager Defendants'* practices in offering short-term leases, let alone in unspecified "Apartment Markets." Plaintiffs' incoherent and unsupported allegation does not remotely allege a plausible parallel pricing strategy.

***Mere licensing of the same software is insufficient***. Finally, merely licensing Revenue IQ cannot establish parallel conduct. In addition to the lack of plausible allegations that the software was used to effectuate a price-fixing scheme, the FAC identifies many reasons why the Manager Defendants would independently license Yardi's product consistent with rational business behavior. These reasons include Yardi advertising that Revenue IQ facilitates fast and flexible rate-setting, maximizing occupancy levels, effectively managing lease expirations and renewals, complying with fair housing rules, and obtaining transparent and comprehensive reporting. *See, e.g.*, FAC ¶¶ 83, 89, 92.[15] These benefits accruing to each user are consistent with independent, unilateral decisions and undermine any inference of a conspiracy. Put another way, Plaintiffs have "indeed provided a context" for property managers' use of Revenue IQ, "but not one that plausibly suggests they entered into illegal horizontal agreements." *In re Musical Instruments*, 798 F.3d at 1198; *see also Gibson II*, 2024 WL 2060260, at *6 ("[M]ere use of algorithmic pricing based on artificial intelligence by a commercial entity, without any allegations

---

[15] *See also id.* ¶ 64 n.9 (citing RJN, Ex. 9) (stating Revenue IQ offers "clear, comprehensive metrics focusing on operational components including rental income, concessions, occupancy and rental rates")); *id.* ¶ 82 n.24 (citing RJN, Ex. 11) (describing "improved operational efficiencies").

about any agreement between competitors—whether explicit or implicit—to accept the prices that the algorithm recommends does not plausibly allege an illegal agreement.").

The implausible nature of Plaintiffs' claims is exacerbated by the failure to allege that the Manager Defendants compete with one another. *See Rick-Mik Enters., Inc.*, 532 F.3d at 976 (explaining a *per se* unlawful conspiracy requires an agreement among competitors). Despite vaguely alleging a "substantial overlap" in the Manager Defendants' operations, FAC ¶ 109, Plaintiffs do not allege that the Manager Defendants operate in the same neighborhoods, much less with similar types of buildings, amenities, or price ranges. If the Manager Defendants did not compete for the same tenants, Plaintiffs cannot establish a "horizontal combination." *Cha-Car, Inc. v. Calder Race Course, Inc*., 752 F. 2d 609, 614 (11th Cir. 1985) (rejecting *per se* treatment where defendant racetracks did not compete for customers or horses); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp*., 475 U.S. 574, 596-97 (1986) (holding that if defendants "had no rational economic motive to conspire, and if their conduct is consistent with other, equally plausible explanations, the conduct does not give rise to an inference of conspiracy").

"Because Plaintiffs fail to allege parallel conduct . . . they cannot demonstrate an agreement to conspire based on indirect evidence irrespective of their plus factors." *City of Pontiac Police & Fire Ret. Sys. v. BNP Paribas Sec. Corp.*, 92 F.4th 381, 401 (2d Cir. 2024); *see also Bona Fide Conglomerate*, 691 F. App'x at 391 ("Plus factors are relevant only if the complaint adequately alleges parallel conduct among the defendants.")

### (2)    The "plus factors" do not plausibly allege a conspiracy

Even if the Court considered Plaintiffs "plus factors," they do not support the claims because they fail to plausibly suggest "economic actions and outcomes that are largely inconsistent with unilateral conduct but largely consistent with explicitly coordinated action." *In re Musical Instruments*, 798 F.3d at 1194; *see also In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig*., 28 F.4th 42, 49 (9th Cir. 2022) (noting such actions are "so perilous . . . no reasonable firm would make the challenged move without" an anticompetitive agreement). Plaintiffs must allege facts that "tend to

1  exclude a plausible and innocuous alternative explanation" for the defendants' conduct.

2  *Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 998 (9th Cir. 2014).

3  Plaintiffs' alleged plus factors, alone or together, fail to plausibly allege a conspiracy

4  and instead are "in line with a wide swath of rational and competitive business strategy

5  unilaterally prompted by common perceptions of the market." *Twombly*, 550 U.S. at 554.

6  **Alleged exchange of competitively sensitive information**. Plaintiffs first point to

7  their conclusory allegation that the Managers Defendants somehow "knew" their

8  confidential data would be pooled to generate prices for competitors. FAC ¶ 102. But as

9  explained above, this allegation is devoid of factual support. *Supra* Arg. § II(A)(3).

10  **Alleged agreement not to compete on price**. Plaintiffs next point to their allegation

11  that the Manager Defendants agreed not to compete on price, and thereby supposedly acted

12  against their economic self-interest. FAC ¶ 81. But again, there is no plausible allegation

13  of an agreement by the Manager Defendants to do anything at all. *Supra* Arg. § II(A)(2).

14  **Alleged opportunities to collude**. Plaintiffs allege that Yardi sponsors "User Groups

15  made up of Property Managers in Apartment Markets" that purportedly allow participants

16  "to further share competitively sensitive information." FAC ¶ 104–07. Not only is the

17  suggestion that User Groups share confidential information wholly conclusory, but

18  Plaintiffs do not allege that any of *the Manager Defendants* participated in such a group.

19  *See Gibson I*, 2023 WL 7025996, at *4 (finding complaint failed to allege "employees of

20  any particular Defendant attended [conferences], much less provide names or anonymized

21  references to the individual employees from each Defendant who attended and therefore

22  could have entered into agreements"); *In re German Auto. Mfrs. Antitrust Litig.*, 392 F.

23  Supp. 3d 1059, 1071–72 (N.D. Cal. 2019) (rejecting allegations that failed to "identify what

24  was agreed to in these [trade association] meetings and instead only vaguely refer to

25  'clandestine agreements to limit technological innovation'"). Plaintiffs do not even allege

26  that "User Groups" consist of Revenue IQ users, as opposed to users of Yardi's property

27  management platform generally. In fact, the cited Yardi website makes clear that such

28  groups allow users of "Yardi products" to "share their interests, knowledge, and skills . . .

30

as well as discuss unique applications of individual environments," which helps provide "focused input to software developers." FAC ¶ 105 n.38-39.[16] Plaintiffs' repeated attempts to twist the innocuous into the suspicious merely reinforces that their claims have no merit.

***Alleged market characteristics***. Finally, Plaintiffs allege that "high barriers to entry in the Apartment Markets make it easier for Defendants to form and maintain their unlawful conspiracy." FAC ¶ 108. However, this allegation is simply a "description[a] of the market, not [an] allegation[] of anything the defendants did." *Erie Cnty. v. Morton Salt, Inc.*, 702 F.3d 860, 870 (6th Cir. 2012) (concluding market-characteristic allegations "d[id] not give rise to an inference of unlawful agreement"); *Jones v. Micron Tech. Inc.*, 400 F. Supp. 3d 897, 917 (N.D. Cal. 2019) ("[M]arket characteristics are . . . neutral facts."). Plaintiffs further allege that "the concentration among Landlords creates opportunities for collusion" because they manage apartments in "multiple markets across the country" and can "communicate efficiently and continuously about their unlawful pricing scheme . . . ." FAC ¶ 109. But again, Plaintiffs do not allege facts to show that *the Manager Defendants* compete in the same areas with similar unit types, such that they might have taken advantage of these alleged market characteristics, or that they have ever communicated with each other on *any* topic. Plaintiffs merely describe generic features of the real estate sector, which fail to provide circumstantial evidence of any unlawful agreement.

In sum, Plaintiffs' "plus factors" fail on every front to plausibly suggest an unlawful agreement. To the contrary, the FAC amply demonstrates that use of Revenue IQ is consistent "with rational and competitive business strategies, independently adopted by firms . . . ." *In re Musical Instruments*, 798 F.3d at 1189.

## III.  Even if an agreement was alleged, *per se* treatment would not apply

Even if the FAC alleged an unlawful agreement—which it does not—*per se* treatment would not apply. Instead, the proper framework would be the rule of reason.

Certain agreements are so plainly anticompetitive they are deemed to violate the

---

[16] RJN, Ex. 12.

DEFENDANTS' OMNIBUS MOTION TO DISMISS

Sherman Act simply through proof of their existence: these are *per se* violations. *Texaco Inc. v. Dagher*, 547 U.S. 1, 5 (2006). In most other cases, the rule of reason applies, which requires a plaintiff to prove that the agreement "is in fact unreasonable and anticompetitive." *Id*. To state a *per se* claim, Plaintiffs must adequately allege an agreement that is both horizontal—*i.e.*, between competitors at the same level of the market—and "clearly and unquestionably" falls into "one of the handful of categories that have been collectively deemed" anticompetitive. *See Expert Masonry, Inc. v. Boone Cnty., Ky*., 440 F.3d 336, 343–44 (6th Cir. 2006). As shown above, Plaintiffs fail to allege an agreement of any kind. Nor does their novel claim fall within the "limited circumstances" meriting *per se* treatment. *RealPage*, 709 F. Supp. 3d at 500 n.8.

The only district courts to have considered the use of revenue management software in the context of a *per se* antitrust violation rejected the claims. The *RealPage* plaintiffs, as here, alleged that property lessors conspired to inflate rents by licensing software that makes pricing recommendations. The court refused *per se* treatment given the plaintiffs' failure to allege (*i*) a direct agreement or communications between the defendants; (*ii*) when each defendant joined the conspiracy; (*iii*) "an absolute delegation of . . . price-setting" to the software; or (*iv*) an ability to enforce the conspiracy by "removing an uncooperative member . . . or applying some other form of punishment." 709 F. Supp. 3d at 500 n.8, 520. Given these "imperfections," this was not the "straightforward" or "traditional" form of price-fixing subject to the *per se* rule. *Id*. at 520.[17]

*Gibson I* dismissed claims that hotel operators conspired to use revenue management software to inflate hotel room prices. 2023 WL 7025996, at *1. The court identified "numerous deficiencies" in the complaint, including a failure "to plausibly allege Defendants entered into an agreement" or exchanged nonpublic information "through the algorithm," *id*. at *2, 4, or that they were "required to accept the [proposed] prices," which was a "fatal deficiency." *Id*. at *3. Judge Du subsequently dismissed the claims outright,

---

[17] The *RealPage* court allowed certain claims to proceed on a rule of reason theory based on highly specific factual allegations that are not present here. *Id*.

DEFENDANTS' OMNIBUS MOTION TO DISMISS

1    with prejudice. *Gibson II*, 2024 WL 2060260, at *9.

2        Even assuming this Court were to find that the FAC adequately alleges a hub-and-

3    spoke conspiracy, the Court should decline to apply *per se* treatment to Plaintiffs' novel

4    theory of antitrust liability, which suffers from the same defects as *RealPage* and *Gibson*.

5    **IV.    The FAC fails to state a claim under the rule of reason**

6        The FAC fails to satisfy the element of a rule-of-reason claim. An unreasonable

7    restraint on competition requires Plaintiffs to adequately allege (*i*) a plausibly defined

8    "relevant market" in which (*ii*) Defendants possess "market power"—*i.e.*, "the power to

9    control prices or exclude competition" on a market-wide basis. *Flaa v. Hollywood Foreign*

10   *Press Ass'n*, 55 F.4th 680, 693 (9th Cir. 2022). The FAC fails across the board.

11       **A.    Plaintiffs fail to allege a plausible relevant market**

12       Plaintiffs must allege a relevant market that is plausible and consistent with well-

13   established legal principles governing the definition of antitrust markets. *See Hicks v. PGA*

14   *Tour, Inc.*, 897 F.3d 1109, 1120 (9th Cir. 2018) (explaining dismissal is warranted where

15   a complaint's "'relevant market' definition is facially unsustainable"); *In re German Auto.*

16   *Mfrs. Antitrust Litig.*, 612 F. Supp. 3d 967, 979 (N.D. Cal. 2020) ("Failure to plead a

17   relevant market is grounds to dismiss."). A plausible market must define relevant products

18   and geographies. *See Hicks*, 897 F.3d at 1120.

19       Plaintiffs allege that the relevant geographic market is "Apartment Markets" "within

20   which [Yardi's customers] compete for renters," and the relevant product market is "the

21   market in which Landlords use Yardi services: the leasing of . . . Mid-Range and High-End

22   Apartments." FAC ¶¶ 110, 113. Plaintiffs' proposed relevant markets are facially deficient.

23       **(1)    No plausible geographic market**

24       A relevant geographic market is the "area of effective competition . . . where buyers

25   can turn for alternate sources of supply." *Netafim Irrigation, Inc. v. Jain Irrigation, Inc.*,

26   562 F. Supp. 3d 1073, 1081 (E.D. Cal. 2021); *see also In re Se. Milk Antitrust Litig.*, 739

27   F.3d 262, 277 (6th Cir. 2014) ("Outlining a geographic market entails mapping an area

28   within which the defendant's customers who are affected by the challenged practice can

practicably turn to alternative suppliers if the defendant were to raise its prices or restrict its output."). Where buyers in one geographic area could not reasonably purchase from suppliers located in a second geographic area, the two areas are not part of the same relevant market. *See U.S. v. Conn. Nat'l Bank*, 418 U.S. 656, 668 (1974) (noting a geographic market "must be delineated in a way that takes into account the local nature of the demand"); *Sharif Pharmacy, Inc. v. Prime Therapeutics, LLC*, 950 F.3d 911, 917 (7th Cir. 2020) (noting a proper geographic market "excludes other potential suppliers . . . whose product is . . . too far away" to be a reasonable substitute).

Plaintiffs define their relevant geographic market as amorphous "Apartment Markets" which are "no larger than the Metropolitan Statistical Areas ("MSAs") as defined by the United States Bureau of Statistics, within which Yardi provides its relevant services to Landlords . . . ." FAC ¶ 113. They further opine that within each unnamed MSA, the relevant geographic market can be whittled down to a "radius extending one to five miles surrounding a particular property" or alternatively can be defined by zip codes. *Id.* ¶¶ 113–14. Yet the FAC fails to identify any *actual* MSA in which Yardi provides "relevant services" or in which Manager Defendants allegedly compete for renters. Nor does the FAC allege that the Manager Defendants have properties in any particular MSA, let alone in a one-to-five mile radius of each other or in the same zip code. And Plaintiffs say nothing about local demand or the existence of reasonable alternatives within any particular MSA or slice of an MSA. The proposed relevant geographic market is no market at all.

Failure to define a relevant geographic market in more than vague and conclusory terms is fatal. *See, e.g., Concord Assocs., L.P. v. Entm't Props. Tr.,* 817 F.3d 46, 53 (2d Cir. 2016) (affirming dismissal where plaintiffs "provided no basis on which to justify their proposed geographic market definition"); *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1103 (N.D. Cal. 2022) (rejecting "worldwide" market for apps); *Sidibe v. Sutter Health*, 4 F. Supp. 3d 1160, 1164 (N.D. Cal. 2013) (rejecting market defined as "local in nature").

### (2)    No plausible product market

Plaintiffs also fail to plausibly allege that the relevant product market should be

34

limited to "the leasing of what Yardi itself defines as Mid-Range and High-End Apartments." FAC ¶ 110. A relevant product market identifies the products that compete with each other, *i.e.*, all reasonable economic substitutes. *See Hicks*, 897 F.3d at 1120 (explaining that a product market must include all products with "reasonable interchangeability of use" such that consumers reasonably regard them as substitutes); *Reilly*, 578 F. Supp. 3d at 1106 (describing principle in terms of "cross-elasticity of demand"). Where a proposed market does not include all interchangeable substitutes, the claim is legally deficient. *See Golden Gate Pharmacy Servs., Inc. v. Pfizer, Inc.*, 433 F. App'x 598, 599 (9th Cir. 2011) ("[F]ailure to allege a product market consisting of reasonably interchangeable goods" renders claim "facially unsustainable.").

Plaintiffs say that mid-range apartments cater to working professionals, whereas high-end apartments cater to discretionary renters, such as those with more income but without wealth and those capable of owning a residence, but who choose to rent. FAC ¶ 111. Beyond these generic descriptions, Plaintiffs do not meaningfully allege such rentals have no interchangeable substitutes, such as rental of single-family homes. They simply claim that buying a property is not equivalent because it requires a down payment and that renters value the convenience of renting. *Id.* ¶ 112. According to Plaintiffs, high-end renters can afford to buy, but do not view a home purchase as a reasonable substitute because it requires a down payment. Not only are Plaintiffs' assertions inherently contradictory, but a generalized allegation that products are not substitutes does not suffice. *See Calabasas Luxury Motorcars, Inc. v. Mercedes-Benz USA, LLC*, 2022 WL 19076646, at *4 (C.D. Cal. Sept. 30, 2022) (dismissing "generalized allegations" about relevant product market); *Reilly*, 578 F. Supp. 3d at 1109 (dismissing complaint lacking "facts explaining why seemingly similar products . . . are not substitutes for those in the [proposed] market"); *Universal Grading Serv. v. eBay, Inc.*, 2012 WL 70644, at *7 (N.D. Cal. Jan. 9, 2012) (rejecting "overbroad and amorphous" product market).[18]

---

[18] *See also In re German Auto. Mfrs. Antitrust Litig.*, 497 F. Supp. 3d 745, 759 (N.D. Cal. 2020) ("Beyond bare allegations and empirical evidence of no value, [plaintiffs] have

Moreover, Plaintiffs' conclusory assertions miss the point. Cross-elasticity of demand assesses interchangeability, but interchangeable products need not be *fungible*. *See Fed. Trade Comm'n v. Microsoft Corp.*, 681 F. Supp. 3d 1069, 1085–87 (N.D. Cal. July 10, 2023) (A product is a reasonable substitute for another when demand for it increases "in response to an increase in the price for the other. . . .  It doesn't matter whether . . . products are fully interchangeable with those of its competitors because perfect fungibility isn't required. . . . [therwise] only physically identical products would be a part of the market."). Whether apartment rentals and home rentals (or purchases) are the same is irrelevant—the question is whether an increase in the price of one would lead to increased demand for the other. *See id*. Plaintiffs' failure to engage with the economic relationship between these alternatives is fatal to their claims. *See Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 956 (9th Cir. 2023) (affirming dismissal where plaintiff failed to show cross-elasticity of demand for smart phone apps); *Hicks*, 897 F.3d at 1123 (finding proposed relevant product markets "facially unsustainable because they fail to include many reasonably interchangeable products").

In sum, rather than plausibly alleging the geographic and product elements of a properly defined relevant market, Plaintiffs "seem[] to have started out with what [they] wanted to accomplish . . . and drawn up a relevant market to accomplish those ends." *Gold Medal LLC v. USA Track & Field*, 187 F. Supp. 3d 1219, 1226–27 (D. Or. 2016).

## B.    Plaintiffs fail to allege market power

To avoid dismissal, Plaintiffs must also plausibly allege that the Manager Defendants have the power to control prices or exclude competition on a market-wide basis. *See Flaa*, 55 F.4th at 693; *Hip Hop Beverage Corp. v. Monster Energy Co.*, 733 F. App'x 380, 381–82 (9th Cir. 2018) (affirming dismissal). Plaintiffs fail to allege either direct or circumstantial evidence of market power. Direct evidence requires explicit examples of the Manager Defendants manipulating market-wide supply and pricing merely

---

alleged nothing to contradict the commonsense inference that diesel passenger vehicles compete with other passenger vehicles and do not constitute a relevant submarket.").

DEFENDANTS' OMNIBUS MOTION TO DISMISS

by restricting output. *See Med Vets Inc. v. VIP Petcare Holdings, Inc*., 2019 WL 1767335, at *5 (N.D. Cal. Apr. 22, 2019); *see also Mylan Pharms. Inc. v. Warner Chilcott Pub. Ltd. Co*., 838 F.3d 421, 434 (3d Cir. 2016) (noting plaintiffs can only allege direct evidence of market power in "rare" cases). Circumstantial evidence requires plausible allegations (*i*) that the defendant possesses a "dominant share" of the relevant market, (*ii*) "there are significant barriers to entry," and (*iii*) "existing competitors lack the capacity to increase their output in the short run." *Hip Hop Beverage Corp*., 733 F. App'x at 381–82.

Plaintiffs fail to allege that the Manager Defendants wield dominant power in *any* market. The FAC lacks any facts about the Manager Defendants' pricing or output and fails to allege any market shares for the Manager Defendants. Plaintiffs do not even allege how many properties or units the Manager Defendants manage, much less the portion using Revenue IQ, or what percentage of the relevant market those units represent.

Instead, Plaintiffs reference *Yardi's* alleged market power, suggesting Yardi is somehow a proxy for its customers given its "admitted and proven ability to raise price and restrict output." FAC ¶¶ 115, 120. Yardi develops and licenses property management software. *Id*. ¶ 32. It does not lease apartments or have any share in an "Apartment Market." The relevant inquiry is the proportion of *each Manager Defendant's units* using Revenue IQ against the market as a whole. Further, Plaintiffs do not—and cannot—cite any legal basis to aggregate independent vertical agreements between Yardi and each Manager Defendant to allege market power. To the contrary, courts reject aggregation under the Sherman Act. *See, e.g., Maris Distrib. Co*., 302 F.3d at 1218 (concluding "aggregation is inappropriate"); *Dickson v. Microsoft Corp*., 309 F.3d 193, 210–11 (4th Cir. 2002) (rejecting aggregation of "discrete" bilateral conspiracies); *In re Amazon.com, Inc. eBook Antitrust Litig*., 2023 WL 6006525, at *25 (S.D.N.Y. July 31, 2023) (rejecting aggregation absent plausible horizontal conspiracy, which left plaintiff with purely vertical agreements between spokes and hub). To the extent Plaintiffs' argument is that Yardi's market share in revenue management software evidences market power, Plaintiffs fail to plead any facts

supporting this contention, nor could they.[19]  Furthermore, Plaintiffs' support for Yardi's "admission" is a 2017 video stating that Revenue IQ users "gained on average over 6% net rental income growth per year while maintaining or improving occupancy." FAC ¶ 115. Plaintiffs continue to conflate revenue growth with "rental prices," but, further, Yardi's statement does not plausibly suggest that every customer raises rents, never mind by 6%. Even so, it says nothing about *the Manager Defendants'* rental rates, nor anything about rents or supply in a relevant market during the relevant timeframe. And no baseline is given to contextualize the figure and explain how the Manager Defendants allegedly manipulated market-wide pricing and supply.

By failing to allege market shares—much less that the Manager Defendants own a "dominant" share of any market—Plaintiffs cannot plausibly allege market power through circumstantial evidence. *See, e.g., Flaa*, 55 F.4th at 693 (rejecting claims containing "no quantitative allegations" to suggest market power); *Kaufman v. Time Warner*, 836 F.3d 137, 148 (2d Cir. 2016) (dismissing complaint alleging "no particular facts bearing on [defendant's] share of the market"); *Rheumatology Diagnostics Lab'y, Inc. v. Aetna, Inc.*, 2013 WL 5694452, at *12 (N.D. Cal. Oct. 18, 2013) (dismissing claim that failed to allege defendant's "market share in any of the five product and geographic markets").

The FAC falls short of meeting any criteria to state a claim under the rule of reason.

## CONCLUSION

Defendants ask the Court to dismiss the FAC with prejudice, as a third attempt to re-plead cannot fix Plaintiffs lack of standing nor Plaintiffs' implausible claims.


RESPECTFULLY SUBMITTED,

DATE: September 30, 2024

---

[19] The Department of Justice (DOJ) recently alleged that RealPage has a monopoly in revenue management software, with "80% to 85% of the market share with the closest competitor around 12%," which if the DOJ proves is true, would render it impossible for Yardi to have anything close to market power. Complaint at ¶ 211, *United States et al. v. RealPage, Inc.*, No. 1:24-cv-00710 (M.D.N.C. Aug, 23, 2024).

DEFENDANTS' OMNIBUS MOTION TO DISMISS

By: /s/ Theodore W. Chandler
**BAKER BOTTS LLP**
Theodore W. Chandler (Bar No. 219456)
ted.chandler@bakerbotts.com

**BAKER BOTTS LLP**
Danny David (*pro hac vice*)
danny.david@bakerbotts.com
910 Louisiana Street
Houston, TX 77002
Telephone: 713.229.4055

James Kress (*pro hac vice*)
james.kress@bakerbotts.com
700 K. Street, NW
Washington, DC 20001
Telephone: 202.639.7884

*Attorneys for Defendant Avenue5 Residential, LLC*

By: /s/ Michael B. Scott
**NARVID SCOTT LLP**
Michael B. Scott (SBN 92912)
mscott@narvidscott.com
15760 Ventura Blvd., 18th Floor,
Encino, CA 91436
Telephone: 818.907.8986, ext. 144

*Attorneys for Defendant Balaciano Group*

By: /s/ Yi-Chin Ho
Yi-Chin Ho (SBN 204834)
yichin.ho@hugheshubbard.com
**HUGHES HUBBARD & REED LLP**
1999 Avenue of the Stars
Los Angeles, CA 90067-4620
Telephone: (213) 613-2888

**GALLAGHER EVELIUS & JONES LLP**
James D. Bragdon (*pro hac vice*

By: /s/ Abraham Tabaie
**DEBEVOISE & PLIMPTON LLP**
Abraham Tabaie (SBN 260727)
atabaie@debevoise.com
David Sarratt (SBN 332438)
dsarratt@debevoise.com
650 California Street
San Francisco, CA 94108
Telephone: (415) 738-5700
Facsimile: (415) 644-5628

Maura K. Monaghan (*pro hac vice*)
mkmonaghan@debevoise.com
Michael Schaper (*pro hac vice*)
mschaper@debevoise.com
Kristin D. Kiehn (*pro hac vice*)
kdkiehn@debevoise.com
66 Hudson Boulevard
New York, NY 10001
Telephone: (212) 909–6000
Facsimile: (212) 909–6836

**SPERTUS, LANDES & JOSEPHS, LLP**
Kevin James Minnick (SBN 269620)
kminnick@spertuslaw.com
617 West 7th Street, Suite 200
Los Angeles, CA 90017
Telephone: 213-205-6520
Facsimile: 213-205-6521

*Attorneys for Defendant Yardi Systems, Inc.*

By: /s/ Charles H. Samel
**STOEL RIVES LLP**
Charles H. Samel (SBN 182019)
charles.samel@stoel.com
Ed Duckers (SBN 242113)
ed.duckers@stoel.com
1 Montgomery Street, Suite 3230
San Francisco, CA 94104
Telephone: 415.617.8900

DEFENDANTS' OMNIBUS MOTION TO DISMISS

forthcoming)
jbragdon@gejlaw.com
Sam Cowin (*pro hac vice* forthcoming)
scowin@gejlaw.com
218 N. Charles St., Suite 400
Baltimore, MD 21201
Telephone: (410) 727-7702

*Attorneys for Defendant Continental Realty Corp.*

By: */s/ Robert J. Herrington*
**GREENBERG TRAURIG, LLP**
Robert J. Herrington (SBN 234417)
robert.herrington@gtlaw.com
Adil M. Khan (SBN 254039)
Adil.Khan@gtlaw.com
1840 Century Park East, Suite 1900
Los Angeles, CA 90067
Telephone: 310.586-7700

Gregory J. Casas (*pro hac vice*)
casasg@gtlaw.com
Emily W. Collins (*pro hac vice*)
emily.collins@gtlaw.com
300 West 6th Street, Suite 2050
Austin, TX 78701-4052
Telephone: 512.320.7200

Becky L. Caruso (*pro hac vice*)
becky.caruso@gtlaw.com
500 Campus Drive, Suite 400
Florham Park, NJ 07932
Telephone: 973.443.3252

Lauren Harrison (*pro hac vice* admission forthcoming)
lauren.harrison@gtlaw.com

Corey Day (SBN 311021)
corey.day@stoel.com
500 Capitol Mall, Suite 1600
Sacramento, CA 95814
Telephone:  916.447.0700

**WILKE FLEURY LLP**
George A. Guthrie (SBN 201263)
gguthrie@wilkefleury.com
621 Capitol Mall, Suite 900
Sacramento, CA 95814
Telephone: 916.441.2430

*Attorneys for Defendant FPI Management, Inc.*

By: */s/ Jason D. Russell*
**SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP**
Jason D. Russell (SBN 169219)
jason.russell@skadden.com
300 South Grand Avenue, Suite 3400
Los Angeles, CA 90071-3144
Telephone : 213.687.5000

Karen Hoffman Lent
Boris Bershteyn
karen.lent@skadden.com
boris.bershteyn@skadden.com
One Manhattan West
New York, NY 10001
Telephone: 917.735.3276

*Attorneys for Defendant Greystar Real Estate Partners, LLC[20]*

By: */s/ David A. Walton*
**BELL NUNNALLY & MARTIN, LLP**
David A. Walton (*pro hac vice* forthcoming)
dwalton@bellnunnally.com
Troy Lee (T.J.) Hales (*pro hac vice*

---

[20] Effective June 23, 2023, Greystar Management Services, L.P. became Greystar Management Services, LLC. Greystar therefore intends to work with plaintiffs to substitute Greystar Management Services, LLC for Greystar Management Services, L.P.

40

DEFENDANTS' OMNIBUS MOTION TO DISMISS

2200 Ross Avenue, Suite 5200
Dallas, TX 75201
Telephone: 214.665.3600

*Attorneys for Defendant Lincoln Property Company*

By: */s/ Michael J. Pepek*
**HALL GRIFFIN LLP**
MICHAEL J. PEPEK, State Bar No. 178238
   mpepek@hallgriffin.com
JEREMY T. KATZ, State Bar No. 267361
   jkatz@hallgriffin.com
1851 East First Street, 10th Floor
Santa Ana, California 92705-4052
Telephone: (714) 918-7000
Facsimile: (714) 918-6996

*Attorneys for Defendant, WESTERN NATIONAL SECURITIES dba WESTERN NATIONAL PROPERTY MANAGEMENT*

By: */s/ Helen C. Eckert*
**SHEPPARD MULLIN RICHTER & HAMPTON LLP**
Leo D. Caseria, Cal Bar No. 240323
lcaseria@sheppardmullin.com
Scott Sveslosky, Cal Bar No. 217660
ssveslosky@sheppardmullin.com
333 South Hope Street, 43rd Floor
Los Angeles, CA 90071
Telephone:  213.620.1780

Helen C. Eckert, Cal Bar No. 240531
heckert@sheppardmullin.com
Four Embarcadero Center, 17th Floor
San Francisco, California 94111-4109
Telephone:  415.434.9100

*Attorneys for Essex Property Trust, Inc.*

forthcoming)
thales@bellnunnally.com
2323 Ross Avenue, Suite 1900
Dallas, TX 75201
Telephone: 214.740.1400

*Attorneys for Defendants RPM Living, LLC, and Asset Living, LLC*

By: */s/ James M. Burns*
**WILLIAMS MULLEN**
James M. Burns
jmburns@williamsmullen.com
8350 Broad Street
Tysons, VA 22102
Telephone: 703.760.5223

Rick Matthews
rmatthews@williamsmullen.com
301 Fayetteville Street
Raleigh, NC  27601
Telephone: 919.981.4070

*Attorneys for Defendant 10 Federal Management, LLC*

DEFENDANTS' OMNIBUS MOTION TO DISMISS

**CERTIFICATE OF COMPLIANCE**

The undersigned, counsel of record for Yardi Systems certifies that the this brief contains 30 pages, which complies with the Court's order dated May 21, 2024 (ECF No. 42).

By:  _/s/ Abraham Tabaie_
Abraham Tabaie (SBN 260727)
atabaie@debevoise.com
650 California Street
San Francisco, CA 94108
Telephone: (415) 738-5700
Facsimile: (415) 644-5628

*Attorney for Defendant Yardi Systems, Inc.*

DEFENDANTS' OMNIBUS MOTION TO DISMISS

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**E-FILING ATTESTATION OF SIGNATURES**

I, Abraham Tabaie, am the ECF user whose ID and password are being used to file this document. In compliance with Civil Local Rule 5-4.3.4(a)(2)(i), I hereby attest that each of the signatories above has concurred in and authorized this filing.

Dated: September 30, 2024

DEBEVOISE & PLIMPTON LLP

By:  _/s/  Abraham Tabaie_
Abraham Tabaie (SBN 260727)
atabaie@debevoise.com
650 California Street
San Francisco, CA 94108
Telephone: (415) 738-5700
Facsimile: (415) 644-5628

*Attorney for Defendant Yardi Systems, Inc.*

DEFENDANTS' OMNIBUS MOTION TO DISMISS

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the above and foregoing document was served on all counsel of record via the Court's CM/ECF system on September 30, 2024.

DEBEVOISE & PLIMPTON LLP

By: */s/ Abraham Tabaie*
Abraham Tabaie (SBN 260727)
atabaie@debevoise.com
650 California Street
San Francisco, CA 94108
Telephone: (415) 738-5700
Facsimile: (415) 644-5628

*Attorney for Defendant Yardi Systems, Inc.*

DEFENDANTS' OMNIBUS MOTION TO DISMISS