Leiv Blad (Cal. Bar No. 151353)
leiv@competitionlawpartners.com
Jeffrey Blumenfeld (Admitted pro hac vice)
jeff@competitionlawpartners.com
Meg Slachetka (Admitted pro hac vice)
meg@competitionlawpartners.com
**COMPETITION LAW PARTNERS PLLC**
601 Pennsylvania Ave., NW
Washington, DC 20004
Telephone: (202) 742-4300
Facsimile: (202) 810-9815

Don Bivens (Admitted pro hac vice)
don@donbivens.com
Teresita T. Mercado (Admitted pro hac vice)
teresita@donbivens.com
**DON BIVENS PLLC**
15169 N. Scottsdale Road, Suite 205
Scottsdale, AZ 85254
Telephone: (602) 708-1450

*Attorneys for Plaintiffs*
*Additional Counsel on Signature Page*

# UNITED STATES DISTRICT COURT

# FOR THE CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DANIEL FRANK, *et al.*,<br><br>on behalf of themselves and all others similarly situated,<br><br>           Plaintiffs,<br><br>    vs.<br><br>YARDI SYSTEMS, INC., *et al.*,<br><br>           Defendants. | Case No. 8:24-cv-00617-MWC(KES)<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' OMNIBUS MOTION TO DISMISS THE FIRST AMENDED COMPLAINT** |

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..................................................................................... iii

MEMORANDUM OF POINTS AND AUTHORITIES ...................................................1

I.    INTRODUCTION ...................................................................................................1

II.   THE FAC PLAUSIBLY ALLEGES CONSPIRACIES INVOLVING, BUT
      NOT DEPENDENT ON, USE OF YARDI'S RENTMAXIMIZER ......................1

III.  PLAINTIFFS ADEQUATELY ALLEGE ANTITRUST STANDING ................5

      A.    Defendants' Argument Is Not the Proper Subject of Rule 12(b)(1) .............7

      B.    The MTD Is Internally Inconsistent and Contradictory...............................9

      C.    Defendants' Standing Argument Is Irrelevant to the Three Elements
            of Their Unlawful Agreement Pleaded in the FAC ...................................10

IV.   THE FAC PLAUSIBLY ALLEGES AN UNLAWFUL AGREEMENT............11

      A.    Yardi's Binding Admissions Are Sufficient Allegations of Unlawful
            Agreements..................................................................................................12

      B.    Plaintiffs Plausibly Allege *Per Se* Claims...................................................16

V.    PLAINTIFFS SUFFICIENTLY ALLEGE A RELEVANT MARKET ..............17

VI.   CONCLUSION.....................................................................................................20

CERTIFICATE OF COMPLIANCE.........................................................................22

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FAC

# TABLE OF AUTHORITIES

## CASES

*Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*
  190 F.3d 1051 (9th Cir. 1999) ............................................................................ 8

*Am. Needle, Inc. v. NFL*
  560 U.S. 183 (2010) .......................................................................... 4, 11, 12, 15

*Am. Tobacco Co. v. United States*
  328 U.S. 781 (1946) ......................................................................................... 12

*Augustine v. United States*
  704 F.2d 1074 (9th Cir. 1983) ............................................................................ 7

*Bell Atl. Corp. v. Twombly*
  550 U.S. 544 (2007) ......................................................................................... 11

*Bell v. Hood*
  327 U.S. 678 (1946) ........................................................................................... 7

*Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*
  429 U.S. 477 (1977) ........................................................................................... 8

*Citizen Publ'g Co. v. United States*
  394 U.S. 131 (1969) ......................................................................................... 16

*Cont'l Ore Co. v. Union Carbide & Carbon Corp.*
  370 U.S. 690 (1962) ........................................................................................... 5

*Copeland v. Energizer Holdings, Inc.*
  2024 WL 511224 (N.D. Cal. Feb. 9, 2024) ..................................................... 15

*Daniels–Hall v. Nat'l Educ. Ass'n*
  629 F.3d 992 (9th Cir. 2010) .............................................................................. 5

*Epic Games, Inc. v. Apple, Inc.*
  67 F.4th 946 (9th Cir. 2023) ............................................................................ 20

*Goldfarb v. Va. State Bar*
  421 U.S. 773 (1975) ......................................................................................... 16

*High Tech. Careers v. San Jose Mercury News*
  996 F.2d 987 (9th Cir. 1993) ............................................................................ 19

*In re Lithium Ion Batteries Antitrust Litig.*
  2014 WL 4955377 (N.D. Cal. 2014) ................................................................ 14

*In re Musical Instruments & Equip. Antitrust Litig.*
  798 F.3d 1186 (9th Cir. 2015) .......................................................................... 15

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FAC

*In re Nat'l Football League's Sunday Ticket Antitrust Litig.*
  933 F.3d 1136 (9th Cir. 2019) ................................................................. 5, 15

*In re RealPage, Inc., Rental Software Antitrust Litig.*
  709 F. Supp. 3d 478 (M.D. Tenn. 2023) ................................................. 16

*Interstate Circuit v. United States*
  306 U.S. 208 (1939) ............................................................................... 12

*Kendall v. Visa U.S.A., Inc.*
  518 F.3d 1042 (9th Cir. 2008) ........................................................... 14, 15

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*
  468 U.S. 85 (1984) .................................................................................. 19

*Newcal Indus., Inc. v. Ikon Office Sol.*
  513 F.3d 1038 (9th Cir. 2008) ............................................................... 19

*PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharm.*
  530 F. Supp. 3d 301 (S.D.N.Y. 2021) .................................................... 19

*Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*
  317 F. Supp. 2d 301 (S.D.N.Y. 2003) .................................................... 17

*Roberts v. Corrothers*
  812 F.2d 1173 (9th Cir. 1987) ............................................................. 7, 8

*Safe Air for Everyone v. Meyer*
  373 F.3d 1035 (9th Cir. 2004) ............................................................. 8, 9

*SmileDirectClub, LLC v. Tippins*
  31 F.4th 1110 (9th Cir. 2022) ............................................................... 11

*Starr v. Baca*
  652 F.3d 1202 (9th Cir. 2011) ............................................................... 11

*Sun Valley Gasoline, Inc. v. Ernst Enters.*
  711 F.2d 138 (9th Cir.1983) ................................................................. 7, 9

*United States v. Masonite Corp.*
  316 U.S. 265 (1942) ............................................................................... 12

*United States v. Patten*
  226 U.S. 525 (1913) ................................................................................. 5

*United States v. RealPage, Inc.*
  No. 1:24-cv-00710 (M.D.N.C. Aug. 23, 2024) ...................................... 16

*United States v. Ritchie*
  342 F.3d 903 (9th Cir. 2003) ........................................................... 5, 6, 7

*United States v. Socony-Vacuum Oil Co.*
  310 U.S. 150 (1940)......................................................................... 4, 12, 17

iv

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FAC

*W. Mining Council v. Watt*
    643 F.2d 618 (9th Cir. 1981) ...................................................................... 7

*White v. Lee*
    227 F.3d 1214 (9th Cir. 2000) ............................................................... 7, 9

**RULES**

Fed. R. Evid. 201(b) ......................................................................................... 7

**TREATISES**

5B Wright & Miller Federal Practice and Procedure (4th ed.) .......................... 6

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FAC

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

Defendants' Omnibus Motion to Dismiss ("MTD," ECF No. 120) the First Amended Complaint ("FAC," ECF No. 100) fails to satisfy any appropriate grounds for dismissal because the FAC adequately alleges claims against Defendants under Section 1 of the Sherman Act. Plaintiffs allege a *per se* price fixing conspiracy among Defendants that has unlawfully and anticompetitively increased the price millions of tenants in the class pay for rental housing. Notably, Defendants' MTD does not challenge the FAC on its face, but instead asks the Court to grant dismissal based on Defendants' extrinsic evidence—four declarations appended to the MTD. For the reasons set forth below, that "evidence" is inappropriate for consideration on a motion to dismiss, especially because this extrinsic evidence bears on a contested merits issue in this case.

Plaintiffs respectfully submit that it is past time to end Defendants' pervasive collusion and provide relief to millions of tenants who are the victims of an unfair pricing system that maintains artificially high prices in the face of municipalities and other government actors—including in this District—trying desperately to increase the supply and lower the costs of rental housing for its citizens. Because the FAC adequately pleads antitrust claims under Section 1 of the Sherman Act, the MTD should be denied.

## II.    THE FAC PLAUSIBLY ALLEGES CONSPIRACIES INVOLVING, BUT NOT DEPENDENT ON, USE OF YARDI'S RENTMAXIMIZER

The FAC pleads that Defendant Yardi Systems, Inc. ("Yardi") uses "its property management software and its aptly named 'RENTmaximizer service,'" Yardi's revenue management software, to "provide[] a platform enabling price fixing among" managers of apartment buildings ("Property Managers") "in apartment markets across the country."

FAC ¶ 6. Plaintiffs allege that Yardi and the Property Managers have entered into an unlawful agreement that has three elements:

> (i)    Property Managers provide to Yardi confidential information about their apartments, including lease pricing and terms;

> (ii)    Property Managers agree to permit Yardi to manage their pricing; and

> (iii)    Property Managers agree not to compete against each other on price.

*Id*. ¶¶ 7-18.

Defendants insist in their MTD that the only conceivable basis of liability could be the use of one specific portion of that Yardi platform, RENTmaximizer. This is a red herring. Plaintiffs' claims involve, but *do not depend on*, Defendants' use of the Yardi RENTmaximizer software. The FAC sufficiently alleges that Yardi's property management *platform*—a panoply of services and functions Yardi provides to its clients—facilitates price fixing among the Property Managers because it empowers Yardi to coordinate Property Managers' pricing. *See*, *e.g.*, FAC ¶ 5 (Yardi guarantees that Property Managers using its platform will increase revenues at least 6%); *id*. ¶ 6 ("Using its property management software and its aptly named 'RENTmaximizer' service, Yardi provides a platform enabling price fixing"); *id*. ¶ 8 (Yardi collects price data from Property Managers, without any reference to RENTmaximizer); *id*. ¶ 10 ("Property Managers agree to let Yardi manage their pricing," no mention of RENTmaximizer); *id*. ¶¶ 14-17 (alleging that Yardi manages the Property Managers' pricing, no mention of RENTmaximizer).

The FAC plausibly alleges that Yardi's price coordination begins with its collection of detailed, real-time price data from Property Managers, which is facilitated by Yardi's property management software platform as a whole, not just RENTmaximizer. *Id*. ¶¶ 5-8. That is because Yardi's property management platform consists of various elements providing a range of functions related to property management activities, which collects all of the information that Property Managers

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FAC

1    enter into that platform across the range of those activities, including granular detail

2    about each apartment, like rent prices. Using that information, Yardi creates a model of

3    each market, which allows it to promise Property Managers that they will have access

4    to "every comp" in the market. *Id*. ¶ 73.

5        Pursuant to its unlawful agreement with Property Managers, Yardi collects its

6    clients' data in particular apartment markets and uses that data to create price

7    "recommendations" for its Property Manager clients that are based on a market-wide

8    analysis of all available comparisons. *Id*. ¶ 11. This pricing system depends on Property

9    Managers not competing with each other on price, and Yardi and its Property Manager

10   clients have repeatedly admitted to this conduct in press releases Yardi issued right up

11   until the time its unlawful conduct was first challenged. *Id*. ¶¶ 18, 66. This collusion

12   allows Property Managers to charge their tenants the highest possible prices. *Id*. ¶ 76.

13   And to further this unlawful conspiracy, Yardi provides "Revenue Managers" to assist

14   Property Managers in imposing artificially high rental prices on the Property Managers'

15   tenants. *Id*. ¶ 63.

16       The FAC plausibly alleges that the Defendants' unlawful agreement raises

17   apartment prices in particular markets across the country because one entity—Yardi—

18   is managing the pricing of Property Managers that have agreed not to compete against

19   each other on price. FAC ¶¶ 6-18. Whether a Property Manager charges the precise

20   price Yardi recommends or uses RENTmaximizer or another element of Yardi's

21   property management software is immaterial. The salient point is that Property

22   Managers have agreed both to let Yardi manage their pricing and to not compete against

23   each other on price in violation of Section 1 of the Sherman Act.

24       Defendants implicitly acknowledge that the FAC's allegations are adequate as

25   pleaded by focusing their MTD not on the face of the FAC, but on their own tortured

26   misinterpretation of the pleading. In their MTD, Defendants misrepresent the FAC by

27   grossly oversimplifying its allegations and then arguing that the oversimplified

28

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FAC

allegations do not apply to them based on their extrinsic evidence. Defendants argue that a Defendant violates Section 1 of the Sherman Act only if it prices a specific lease to a specific tenant using RENTmaximizer at a specific apartment building. MTD at 9. Defendants then attach declarations from executives at Yardi and the Property Managers arguing that the Defendants did not use RENTmaximizer at particular properties at which the named Plaintiffs rent apartments. (*See* MTD Exs. A-D, ECF Nos. 120-1, 120-2, 120-3 & 120-4.) Defendants cannot meet their burden by waving away the actual text of the FAC.

Indeed, the MTD itself effectively admits the gravamen of the FAC. *First*, it admits that Yardi provides pricing "recommendations" to the Property Managers, which Yardi could provide only after it collected and analyzed the Property Managers' data. MTD at 11-12. While Yardi asserts that the Property Managers are not obligated to follow its price recommendations, the Supreme Court has made clear that an arrangement by which competitors cede authority to a single entity to provide a *starting point* for negotiations with customers violates Section 1. *See Am. Needle, Inc. v. NFL*, 560 U.S. 183, 195 (2010) (holding that the "key" question is whether the alleged conspiracy "deprives the marketplace of independent centers of decisionmaking . . . and thus of actual or potential competition") (quotations and citations omitted); *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 223-24 & n.59 (1940) ("Proof that a combination was formed for the purpose of fixing prices and that it caused them to be fixed or contributed to that result is proof of the completion of a price-fixing conspiracy under s 1 of the [Sherman] Act.").

*Second*, Defendants' reliance on their extrinsic claims that the Property Managers did not use RENTmaximizer ignores the FAC's allegations that the Property Managers unlawfully agreed not to compete with each other on price. FAC ¶ 6. That agreement also is an independent violation of Section 1. *Am. Needle,* 560 U.S. at 195. For all of these reasons, Defendants' argument—that the Property Managers can be liable only if

1   they use RENTmaximizer—cannot support dismissal of the FAC.

2       Defendants' attempts to misconstrue and decouple these allegations is improper,

3   particularly on a motion to dismiss. As the Supreme Court has held in the Sherman Act

4   context, "[t]he character and effect of a conspiracy are not to be judged by

5   dismembering it and viewing its separate parts, but only by looking at it as a whole."

6   *Cont'l Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 699 (1962) (citing

7   *United States v. Patten*, 226 U.S. 525, 544 (1913)); *In re Nat'l Football League's*

8   *Sunday Ticket Antitrust Litig.*, 933 F.3d 1136 (9th Cir. 2019) (quoting same). In an

9   antitrust conspiracy case, "plaintiffs should be given the full benefit of their proof

10  without tightly compartmentalizing the various factual components and wiping the slate

11  clean after scrutiny of each." *Cont'l Ore Co,* 370 U.S. at 699. Viewed holistically, as it

12  must be, the FAC plausibly alleges conspiracies between Yardi and the Property

13  Managers and among the Property Managers to fix prices of apartment leases.

14  Defendants' MTD should therefore be denied.

15  **III.   PLAINTIFFS ADEQUATELY ALLEGE ANTITRUST STANDING**

16      Generally, in evaluating Rule 12 motions to dismiss, courts consider only the

17  allegations presented on the face of a plaintiff's complaint, accepting them as true and

18  construing them favorably toward the non-moving party. *Daniels–Hall v. Nat'l Educ.*

19  *Ass'n,* 629 F.3d 992, 998 (9th Cir. 2010) ("We accept as true all well-pleaded

20  allegations of material fact, and construe them in the light most favorable to the non-

21  moving party.").

22      Extrinsic evidence may only be considered in adjudicating such motions if such

23  evidence is: (i) referenced in the complaint, (ii) central to the plaintiff's claim, and (iii)

24  there is no dispute as to its authenticity. *Id.* For example, courts rely on contracts to

25  resolve motions to dismiss a breach of contract claims and federal agency guidance to

26  inform motions to dismiss constitutional challenges to federal governmental action. *See*

27  *United States v. Ritchie,* 342 F.3d 903, 908-09 (9th Cir. 2003) (contrasting appropriate

28

incorporation by reference and subsequent reliance on insurance coverage plan and SEC filings with inappropriate incorporation and reliance on declaration prepared for purposes of litigation).

Defendants' one-sided self-serving declarations (MTD Exs. A-D, ECF Nos. 120-1, 120-2, 120-3 & 120-4) are not referenced in the FAC and are not central to Plaintiffs' claims as actually pleaded in the FAC. Nor can Plaintiffs assess the truthfulness of these declarants, who have not been cross-examined. It therefore is inappropriate to consider this evidence on a motion to dismiss. *Ritchie,* 342 F.3d at 909 (holding that it would be "improper for the court to consider the declaration and exhibits . . . without converting the motion to dismiss to a summary judgment motion and giving [the non-movant] an opportunity to respond").

Defendants nevertheless ask the Court to consider their extrinsic evidence on the grounds that their motion is one to dismiss for lack of subject matter jurisdiction under Rule 12(b)(1). MTD at 9. Defendants argue that Plaintiffs lack standing because the FAC supposedly "rest[s] entirely on the Manager Defendants' purported use of [RENTmaximizer] to fix prices." MTD at 14. From there, they posit that because "Plaintiffs did not live in buildings that used [RENTmaximizer they] could not have been harmed by this alleged conduct [and therefore] lack Article III and antitrust standing." *Id*. Setting aside Defendants' purposeful misconstruction of the FAC solely for purposes of argument, Defendants claim that the Court may consider material outside the complaint in evaluating their Rule 12(b)(1) standing argument.

Yet Defendants' standing argument is merely a Rule 12(b)(6) argument on the merits, masquerading as a jurisdictional one. A proper Rule 12(b)(1) motion "raises the fundamental question of whether the federal district court has subject matter jurisdiction over the action before it." 5B Wright & Miller Federal Practice and Procedure § 1350 (4th ed.). A defendant may assert that a Rule 12(b)(1) motion can be decided solely on the face of the complaint or, as Defendants claim here, that the Court must resolve

factual issues presented by extrinsic evidence. *See White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000) (noting that "a court may look beyond the complaint to matters of public record" in construing a 12(b)(1) motion). Critically, however, "[a] court may not resolve genuinely disputed facts where 'the question of jurisdiction is dependent on the resolution of factual issues going to the merits.'" *Roberts v. Corrothers*, 812 F.2d 1173, 1177 (9th Cir. 1987) (quoting *Augustine v. United States*, 704 F.2d 1074, 1077 (9th Cir. 1983)); *see also Ritchie*, 342 F.3d at 908 ("Courts may only take judicial notice of adjudicative facts that are 'not subject to reasonable dispute.'") (quoting Fed. R. Evid. 201(b)).

Instead, "the district court assumes the truth of allegations in a complaint … unless controverted by undisputed facts in the record." *Roberts,* 812 F.2d at 1177 (citing *W. Mining Council v. Watt*, 643 F.2d 618, 624 (9th Cir. 1981)). This is true even on motions to dismiss challenging federal jurisdiction over the plaintiff's claims where, as here, jurisdiction is dependent on disputed factual issues. *Id*. For these reasons, jurisdictional dismissals are "exceptional" and proper only when a plaintiff's claims are "wholly insubstantial and frivolous." *Sun Valley Gasoline, Inc. v. Ernst Enters.*, 711 F.2d 138, 140 (9th Cir.1983) (citing *Bell v. Hood*, 327 U.S. 678, 682-83 (1946)).

There are three fatal flaws that doom Defendants' standing argument. *First*, it is not a proper subject of a Rule 12(b)(1) motion because it is dependent on resolution of issues on the merits and does not raise an issue of the substantive jurisdiction of this Court. *Second*, Defendants contradict their own argument elsewhere in the MTD. *Third*, the argument ignores the three elements of the unlawful agreement the FAC alleges, none of which are undermined by Defendants' standing argument. For all of these reasons, Defendants' jurisdictional arguments fail.

### A.    Defendants' Argument Is Not the Proper Subject of Rule 12(b)(1)

Defendants ask this Court to resolve their standing argument based on extrinsic evidence, justifying their departure from the typical Rule 12(b)(6) guardrails by framing

their argument around Rule 12(b)(1). Yet, Defendants' antitrust standing argument relies on resolving a fact-based inquiry that impermissibly depends on the resolution of the merits of the FAC. *See Roberts*, 812 F.2d at 1177. Defendants' argument therefore should be rejected.

To establish standing, Plaintiffs must plausibly allege an "injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489 (1977). The Ninth Circuit has held that antitrust injury consists of four elements: "(1) unlawful conduct, (2) causing an injury to the plaintiff, (3) that flows from that which makes the conduct unlawful, and (4) that is of the type the antitrust laws were intended to prevent." *Am. Ad Mgmt., Inc. v. Gen. Tel. Co. of Cal.*, 190 F.3d 1051, 1055 (9th Cir. 1999).

Plaintiffs' allegations satisfy each element of this inquiry. Price fixing is unlawful under the Sherman Act, and Plaintiffs' injury—paying an artificially high price for their living space—is one that flows from the Defendants' unlawful conduct and is of the type the antitrust laws were intended to prevent. The parties do not disagree that the FAC on its face satisfies Plaintiffs' burden to defeat a Rule 12 motion. We know this because Defendants do not attack the FAC on its face, but rather focus on inappropriately raising disputed facts outside the FAC. Defendants also attack the truth of the factual allegations that invoke federal jurisdiction, which is impermissible on a 12(b)(1) motion. *See, e.g.*, *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1040 (9th Cir. 2004) (holding that the trial court erred in granting a Rule 12(b)(1) motion to dismiss because the "jurisdictional issue and substantive issues" were "so intertwined that the question of jurisdiction is dependent on the resolution of factual issues going to the merits").

In any event, Defendants have not satisfied the high bar for Rule 12(b)(1) dismissals, which when "premised on federal-question jurisdiction are exceptional, and

8

must satisfy the requirements specific in *Bell v. Hood*." *Sun Valley Gasoline,* 711 F.2d at 140 (citation omitted). Construing the constitutional claims against the Federal Bureau of Investigation at issue in *Bell*, the Supreme Court held that 12(b)(1) dismissals are warranted "where the alleged claim under the Constitution or federal statutes clearly appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such claim is wholly insubstantial and frivolous." *Id*. at 682-83. For these reasons, the Ninth Circuit generally has limited 12(b)(1) jurisdictional dismissals to cases in which the plaintiff improperly invokes federal court jurisdiction over an issue that is more properly resolved by another branch of government or through the political process. *See Meyer*, 373 F.3d at 1037 (affirming dismissal of action by environmental group against commercial farmers alleging that open burning of bluegrass harmed the public at large and violated the Resource Recovery and Conservation Act); *White*, 227 F.3d at 1220 (affirming dismissal of civil rights action by neighbors who opposed conversion of motel into multi-family housing alleging that HUD's investigation into their activities violated their First Amendment rights).

That is not the case here. Plaintiffs plausibly allege violations of Section 1 of the Sherman Act, and even Defendants do not argue that Plaintiffs are attempting to push into federal court wholly insubstantial or frivolous claims. Defendants' motion therefore should be denied, or alternatively be treated as a Rule 56 motion that can be resolved only after the parties have completed discovery and Plaintiffs are afforded an opportunity to respond.

## B.    The MTD Is Internally Inconsistent and Contradictory

Defendants argue principally throughout their MTD that their conduct could have harmed Plaintiffs only if: (i) the Property Manager of the building in which a Plaintiff rents an apartment used RENTmaximizer and (ii) that Property Manager used RENTmaximizer to price that Plaintiff's specific lease. MTD at 16. This is a gross misreading of Plaintiffs' claims. In contrast, the FAC alleges that: (i) Defendants'

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FAC

unlawful price fixing agreement raises prices in *each* apartment market, *regardless* of whether a Property Manager uses RENTmaximizer to price a particular lease; and (ii) it is that unlawful agreement between Yardi and the Property Managers that increases rent prices nationwide and harms Plaintiffs through the capabilities of the Yardi platform, not merely or necessarily through the use of RENTmaximizer. FAC ¶¶ 6-18.

Defendants' MTD addresses—and perhaps unwittingly resolves—this conflict. The MTD admits that Plaintiffs' theory is *not* that they were harmed solely by Defendants' use of RENTmaximizer, but rather by the increase in rents caused by Defendants' unlawful collusion. MTD at 13 (recognizing that the FAC alleges that Plaintiffs "paid 'higher lease prices' for their living spaces because of Defendants' alleged 'conduct.'") (quoting FAC ¶¶ 27-31). Defendants further acknowledge that the FAC pleads "that Defendants 'entered into an unlawful price-fixing agreement,' the purpose and effect of which was to restrain competition." MTD at 13 (quoting FAC ¶¶ 139-40). These acknowledgements correctly cite the FAC, and otherwise demonstrate that Plaintiffs' claims are not dependent on a Property Manager's use of RENTmaximizer.

### C.    Defendants' Standing Argument Is Irrelevant to the Three Elements of Their Unlawful Agreement Pleaded in the FAC

The FAC alleges that Defendants' unlawful agreement has three elements: (i) Property Managers providing their pricing data to Yardi; (ii) Property Managers ceding pricing authority to Yardi; and (iii) Property Managers agreeing not to compete against each other on price. FAC ¶¶ 6-18. None of these three elements depend on the Property Managers' use of RENTmaximizer.

The MTD admits (or, at least, does not contest) that Property Managers give their pricing data to Yardi and that Yardi uses that data to create price "recommendations" for the Property Managers. MTD at 11-12. The parties presumably differ on the precise consequences of those facts, but those are merits issues that can be resolved only by

engaging in discovery. While Defendants contest whether the Property Managers have agreed not to compete, their binding admissions catalogued in the FAC either conclusively admit Plaintiffs' allegation or, at a minimum, create a factual issue that can only be resolved after fact discovery is complete.

That many Property Managers use RENTmaximizer is a relevant issue in the case, and Plaintiffs intend to prove its anticompetitive consequences on summary judgment and at trial. But the elements of the alleged unlawful agreement do not *depend* on the Property Managers' use of RENTmaximizer. *Am. Needle,* 560 U.S. at 195. Defendants' standing argument therefore is insufficient to require dismissal of the FAC.

## IV. THE FAC PLAUSIBLY ALLEGES AN UNLAWFUL AGREEMENT

As the Supreme Court has held, whether there are "plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007). Thus, on a Rule 12 motion, courts do not weigh competing plausible explanations from the parties. Instead, "[i]f there are two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss." *Starr v. Baca*, 652 F.3d 1202, 1216 (9th Cir. 2011). Nor will courts consider "competing facts" raised by defendants at the pleadings stage. *SmileDirectClub, LLC v. Tippins*, 31 F.4th 1110, 1121 (9th Cir. 2022). Instead, plaintiffs must only plead "enough fact[s] to raise a reasonable explanation that discovery will reveal evidence of illegal agreement" to support their claims. *Twombly*, 550 U.S. at 556. Plaintiffs here have more than met this standard.

Defendants blithely ignore the standard for pleading agreement to fix price in violation of the Sherman Act. The Supreme Court has held that the "circumstances surrounding the making of [such] agreements," including that each defendant was "aware" that "its contract was not an isolated transaction but part of a larger arrangement," left "no room for doubt that all had an awareness of the general scope and purpose of the undertaking" sufficient to establish an illegal agreement. *United*

*States v. Masonite Corp.*, 316 U.S. 265, 275 (1942). And it is "enough that, knowing that concerted action was contemplated and invited, the [defendants] gave their adherence to the scheme and participated in it." *Interstate Circuit v. United States*, 306 U.S. 208, 227 (1939). Here, the FAC is replete with admissions from the Property Managers about their participation in the anticompetitive conspiracy. Plaintiffs need do no more at the pleading stage.

Section 1 of the Sherman Act thus prohibits "the elimination of competition that would otherwise exist" absent agreements not to compete on price. *See Am. Needle*, 560 U.S. at 195 (citation omitted). For this reason, the Sherman Act makes it *per se* illegal for horizontal competitors to surrender independent decision-making authority to a single entity for the purpose of fixing or stabilizing prices. *See Socony-Vacuum*, 310 U.S. at 223-24 & n.59; *Am. Needle*, 560 U.S. at 195. Where competitors cede decisionmaking authority to a single entity in violation of Section 1, they "deprive the marketplace of independent centers of decisionmaking" over price. *See Am. Needle*, 560 U.S. at 195 (citations omitted). "No formal agreement is necessary" to commit such a violation of Section 1. *See Am. Tobacco Co. v. United States*, 328 U.S. 781, 809 (1946). Nor is it necessary to allege contemporaneous conduct. "It is elementary that an unlawful conspiracy may be and often is formed without simultaneous action or agreement on the part of the conspirators." *Interstate* Circuit, 306 U.S. at 227. An informal or tacit agreement is sufficient, particularly where, as here, the conspirators' "course of conduct and execut[ion]" demonstrates that they are acting pursuant to an agreement. *See Direct Sales Co. v. United States*, 319 U.S. 703, 714 (1943).

A. **Yardi's Binding Admissions Are Sufficient Allegations of Unlawful Agreements**

Arguing that Plaintiffs have not sufficiently alleged agreements between Yardi and the Property Managers and among the Property Managers themselves, Defendants assert that, while such allegations usually involve an admission by one of the

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FAC

Defendants, "[n]o such admissions … are alleged here." MTD at 19. That argument blithely ignores the repeated brazen admissions by Yardi and its Property Manager customers including some of the Defendants in this case, alleged in the FAC, that Yardi's platform allows Property Managers to price above a competitive level, effectively eliminating competition. For example:

1.    Paragraph 13 quotes a Yardi press release in which a Property Manager boasts that "Yardi 'simplifies the process by eliminating rent rate guesswork and traditional sales devices such as concessions and specials.'" FAC ¶ 13.

2.    Paragraph 19 summarizes Yardi's admission that "its collusive system increases the prices Property Managers charge their tenants by at least 6% above the market level and above the level the Property Managers would have charged had they set prices unilaterally." *Id*. ¶ 19.

3.    Paragraph 72 quotes Yardi's promise to Property Managers that "[w]ith this transparent system you will see everything from rental rates and occupancy data to property performance benchmarking (compared to the market, submarket and competition)." *Id*. ¶ 72.

4.    Paragraph 79 quotes Yardi promising Property Managers that with its collusive system "[y]ou manage your business, we manage your pricing." *Id*. ¶ 79.

5.    Paragraph 80 quotes Yardi stating that its Revenue Managers "control pricing at the property level." *Id*. ¶ 80.

6.    Paragraph 83 notes that Yardi broadcast its boast that its clients beat the market by 6% "while maintaining or improving occupancy"—which is possible only through collusion—over Facebook. *Id*. ¶ 83.

7.    Paragraph 88 quotes a Property Manager admitting that Yardi's system allowed it to "push[] rents without sacrificing occupancy, which … eliminates the fear factor of exposure" to competitive bids because the Property Owners had agreed not to compete on price. *Id*. ¶ 88.

8.    Paragraph 89 quotes an executive from Defendant 10 Federal Companies admitting that with Yardi's system "our renewal rates are sustainable, and we don't have to offer concessions." *Id*. ¶ 89.

Defendants' claim that "Plaintiffs allege zero facts about what role any of the Manager Defendants played in the alleged conspiracy" is simply false. The FAC is replete with admissions by Property Managers that Yardi's system enables them to price above the market level, which is possible only if the Property Managers are not competing on price. Indeed, the FAC specifically allege—as Yardi admits—that the Property Manager Defendants are successfully pricing their rents above the level they would have charged had they priced the rents unilaterally. FAC ¶ 5. And the FAC alleges specific quotes by identified Property Managers admitting that Yardi's system allows them to achieve a price "stability" above the level they would be charging in a competitive market. *E.g.*, FAC ¶¶ 66, 95.

Nor must Plaintiffs plead the kind of exacting details Defendants claim are necessary at this stage of the litigation.   Ninth Circuit law is clear that plaintiffs opposing a motion to dismiss are "not required to identify exactly how, when, and through whom each Defendant joined the conspiracy." *In re Lithium Ion Batteries Antitrust Litig.*, 2014 WL 4955377, at *30-31 (N.D. Cal. 2014).  Rather, a pleading need only contain allegations sufficient to plausibly suggest that each defendant "joined the conspiracy and played some role in it." *Id.*

Defendants nevertheless assert that, under the Ninth Circuit's ruling in *Kendall*, the FAC fails to plead sufficient facts of "who, did what, to whom (or with whom), where, and when?"  MTD at 20 (citing *Kendall v. Visa U.S.A., Inc.*, 518 F.3d 1042, 1047 (9th Cir. 2008)).[1]  This is an overreading of *Kendall*, which "does not establish a heightened pleading standard applicable only to antitrust conspiracy cases.  Nor could

---

[1] The *Kendall* plaintiffs were also afforded an opportunity to conduct discovery and take depositions before amending their complaint.  518 F.3d at 1047, 1051.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FAC

it." *Copeland v. Energizer Holdings, Inc.*, 2024 WL 511224, at *4 (N.D. Cal. Feb. 9, 2024). Federal Rules of Civil Procedure 8 and 12 apply with equal force to antitrust cases as to all other civil litigation. *Id.* And the facially deficient complaint at issue in *Kendall*, which pleaded no evidentiary facts is plainly distinguishable from the FAC. 518 F.3d at 1047. Here, Plaintiffs allege that Yardi and the Manager Defendants engaged in a price fixing conspiracy, which included the Property Managers' agreements to cede authority to Yardi to coordinate pricing and the Property Managers' agreements not to compete with each other on price, thus causing tenants in apartment markets across the country to pay illegally high rents during the class period. The FAC is supported by Defendants' own public statements touting the success of the conspiracy. No more is required to defeat a motion to dismiss.

Moreover, the MTD itself admits that Yardi provides pricing recommendations to Property Managers. MTD at 11-12. While Defendants argue that the Property Managers are not obligated to follow Yardi's pricing recommendations, that disputed fact is irrelevant to the legal issue of whether those recommendations violate Section 1, and cannot sustain a motion to dismiss. *Am. Needle,* 560 U.S. at 195.

The MTD relies heavily on the Ninth Circuit's opinion in *Musical Instruments* affirming dismissal of a Section 1 claim to attack the FAC. *In re Musical Instruments & Equip. Antitrust Litig.*, 798 F.3d 1186 (9th Cir. 2015). However, as the Court of Appeals recognized only four years later, "*Musical Instruments* does not require a court to break down an alleged conspiracy into its constituent parts." *Sunday Ticket*, 933 F.3d at 1152. Rather, the appellate court clarified, "*Musical Instruments* merely explained the uncontroversial principle that, in general, horizontal agreements are analyzed under per se rules, while vertical agreements are analyzed under the rule of reason." *Id.* So too, here. The FAC alleges a horizontal price-fixing conspiracy among Property Managers in violation of Section 1.

In sum, Defendants admit that they coordinate price operations with and through

Yardi. They admit that Yardi provides price "recommendations" to Property Managers. MTD at 11-12. Those admissions are sufficient to sustain the FAC on a motion to dismiss because collectively delegating pricing decisions to a single entity is *per se* unlawful under Section 1. *See Citizen Publ'g Co. v. United States*, 394 U.S. 131, 133-36 (1969) ("Price-fixing is illegal per se."). Moreover, providing a *starting point* for negotiations is itself a violation of Section 1, even if the co-conspirator chooses to deviate from the recommendation to some extent. *See Goldfarb v. Va. State Bar*, 421 U.S. 773, 776, 782-83 (1975) (disseminating the bar association's suggested fee schedules were sufficient to allege price fixing and a *per se* violation of Section 1). Accordingly, the FAC alleges an agreement sufficient to overcome the MTD.

### B.    Plaintiffs Plausibly Allege *Per Se* Claims

For these same reasons, Defendants' assertion that the *per se* rule does not apply to Plaintiffs' claims is incorrect. Defendants admit that the *per se* rule applies to price fixing claims like those alleged here, but argue that decisions in the cases against RealPage, Inc.,[2] Yardi's horizontal competitor, compel the Court to decide now, before discovery even begins, that the *per se* rule does not apply. MTD at 31-33. The *RealPage* cases are significant in that they show that the market in which Yardi operates is subject to collusion, but the allegations in the FAC are distinguishable from those made in either of the *RealPage* cases, and are meritorious on a separate basis.

The U.S. Department of Justice and private plaintiffs allege that RealPage and its co-defendants violated Section 1 by using algorithms to price apartment leases. *See, e.g.*, *RealPage*, 709 F. Supp. 3d at 492 ("The conspiracy is facilitated by revenue management software that takes property owners' and managers' sensitive pricing and

---

[2] RealPage is a defendant in multidistrict litigation pending in the Middle District of Tennessee and in a lawsuit filed by the Antitrust Division of the Department of Justice in the Middle District of North Carolina. *United States v. RealPage, Inc.*, No. 1:24-cv-00710 (M.D.N.C. Aug. 23, 2024); *In re RealPage, Inc., Rental Software Antitrust Litig.*, 709 F. Supp. 3d 478 (M.D. Tenn. 2023).

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FAC

supply data, applies its algorithm across this data, and then spits out price recommendations for each rental unit.") Here, in contrast, Plaintiffs allege that the Defendants have reached agreements to fix prices and not to compete on price. FAC ¶¶ 6-19. Price fixing is the targeted conduct that has been at the heart of Section 1 *per se* cases for more than 120 years. *Socony-Vacuum*, 310 U.S. at 218 (noting in 1940 that "for over forty years this Court has consistently and without deviation adhered to the principle that price-fixing agreements are unlawful per se under the Sherman Act"). For these reasons, *per se* treatment is appropriate here.

At the very least there is no reason for the Court to decide this issue now. Where, as here, the motion to dismiss will be denied, courts need not determine solely on the pleadings whether to apply *per se* treatment or the rule of reason analysis to antitrust claims. *See, e.g., Reading Int'l, Inc. v. Oaktree Capital Mgmt. LLC*, 317 F. Supp. 2d 301, 319 (S.D.N.Y. 2003). Discovery will reveal whether the *per se* rule ultimately is appropriate, and the parties can provide the Court with more meaningful briefing on summary judgment after discovery has closed. For this reason, Plaintiffs respectfully suggest that it would be more efficient for the Court to defer ruling on this issue until summary judgment briefing gives the Court sufficient context for that ruling.

## V.    PLAINTIFFS SUFFICIENTLY ALLEGE A RELEVANT MARKET

Defendants' argument regarding the relevant market is remarkably disingenuous given that the market definition alleged in the FAC is taken directly from Yardi's own description of the market in which it provides property management services, namely Mid-Range and High-End Apartments. The FAC defines this as "the markets in which Property Managers use Yardi services: the leasing of what Yardi itself defines as Mid-Range and High-End Apartments." FAC ¶ 110. The FAC again relies on Yardi's website:

> Yardi sets these segments apart on its website as distinct segments within
> the multifamily residential space and its rates Apartments within these

segments from A+ to B-. Mid-Range Apartments cater to working professionals, police officers, firefighters, teachers, and technical workers. High-End Apartments cater to discretionary renters, such as households with more income but without wealth and households capable of owning a residence, but who choose to rent.

*Id*. ¶ 111.

The definition of the geographic market in the FAC also is taken from Yardi's own description of the markets in which it operates. The FAC defines the relevant geographic markets by quoting Yardi's statement that the markets they serve are "are the individual markets within which Property Managers compete for renters and is no larger than the Metropolitan Statistical Areas ('MSAs') as defined by the United States Bureau of Statistics, within which Yardi provides its relevant services to Property Managers of Mid-Range and High-End Apartments." *Id*. ¶ 113.

The FAC alleges that Yardi asserts in its marketing materials that "[e]ach such geographic market within which Property Managers compete for renters corresponds to an MSA." *Id*. ¶ 114. According to Yardi, the market may also be limited to a radius of one to five miles around a particular property or to properties within a zip code or a combination of zip codes. *Id*.

Not surprisingly, Defendants do not contest the market definition that is taken from Yardi's own description, but rather protest that Plaintiffs have not identified a particular MSA in which a Defendant operates and have not described the competitive conditions within such an MSA. MTD at 34. To the contrary, Plaintiffs have identified the location of both the Plaintiff renters and the Defendant Property Managers, which is more than sufficient to identify the MSAs in which each operates. After all, Los Angeles, San Francisco, Oakland, Atlanta, Dallas, Houston, Austin, Seattle, Raleigh, and the Washington, D.C. metropolitan area are all MSAs in which either the Plaintiffs rent or the Defendants operate. The FAC need not do more at the pleading stage than

identify these areas and describe the anticompetitive conduct in which Defendants have engaged in those markets. *See PharmacyChecker.com, LLC v. Nat'l Ass'n of Bds. of Pharm.*, 530 F. Supp. 3d 301, 348-49 (S.D.N.Y. 2021) (holding on a motion to dismiss that a plaintiff "may, but is not required to, allege a geographic market that is smaller than nationwide" and noting defendants could challenge the market definition on summary judgment).

Similarly deficient is Defendants' complaint that the FAC does not provide a detailed economic analysis of the point at which an increase in the prices of houses would cause an individual to rent an apartment rather than buy a house. MTD at 35-36. To the extent this is even relevant, there may come a time for an expert economist to provide such testimony, but the FAC need not engage in such detailed economic analysis to defeat a Rule 12 motion.  As the Ninth Circuit has repeatedly held, the definition of a relevant market is a factual question appropriate for a jury, and inappropriate to be determined on the pleadings.  *Newcal Indus., Inc. v. Ikon Office Sol.*, 513 F.3d 1038, 1045 (9th Cir. 2008) (holding that "the validity of the 'relevant market' is typically a factual element rather than a legal element" and thus appropriate for "factual testing by summary judgment or trial"); *High Tech. Careers v. San Jose Mercury News*, 996 F.2d 987, 990 (9th Cir. 1993) (holding that "[t]he process of defining the relevant market is a factual inquiry for the jury"). It is enough for the FAC to identify the relevant product market given Yardi's own admission that renters in the defined markets would rather rent apartments (FAC ¶ 111) than bear the cost of owning a home.

Finally, Defendants' assertion that Plaintiffs have not adequately alleged market power also is incorrect. Market power is the ability to raise price or restrict output. *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85, 109 & n.38 (1984).  At the pleading stage, plaintiffs need only plausibly allege Defendants' market power and put forward "'some evidence' that the challenged restraint harms

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FAC

competition." *Epic Games, Inc. v. Apple, Inc.*, 67 F.4th 946, 983 (9th Cir. 2023) (quoting *Ohio v. Am. Express Co.*, 585 U.S. 529, 542 (2018)).  The FAC repeatedly quotes Yardi and its customers proudly announcing that they are able to charge lease prices at least 6 percent above the market level at the same time they can avoid offering discounts and control levels of occupancy. *See, e.g.,* FAC ¶¶ 83, 85-93. These admissions that Defendants actually raise price above the market level at the same time they are controlling levels of occupancy is direct evidence of market power and are more than sufficient to survive Defendants' MTD.

## VI.    CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny the Omnibus Motion to Dismiss.

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FAC

Dated: November 15, 2024

/s/ Leiv Blad
Leiv Blad (Cal. Bar No. 151353)
Jeffrey Blumenfeld (*pro hac vice*)
Meg Slachetka (*pro hac vice*)
COMPETITION LAW PARTNERS PLLC
601 Pennsylvania Avenue, NW
Washington, DC  20004
Telephone: (202) 742-4300
Facsimile: (202) 810-9815

Don Bivens (*pro hac vice*)
don@donbivens.com
Teresita Mercado (*pro hac vice*)
teresita@donbivens.com
DON BIVENS PLLC
15169 N. Scottsdale Road
Suite 205
Scottsdale, AZ 85254
Telephone: (602) 708-1450

Scott D. Tenley (Cal. Bar No. 298911)
scott@tenleylaw.com
TENLEY LAW, P.C.
2601 Main Street, Suite 850
Irvine, CA 92614
Telephone: (949) 749-2300

*Attorneys for Plaintiffs*

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FAC

1

## <u>CERTIFICATE OF COMPLIANCE</u>

The undersigned, counsel of record for Plaintiffs, certifies that this brief contains 6,389 words, which:

    ✖    complies with the word limit of L.R. 11-6.1.

    ___    complies with the word limit set by Court order dated _____.

DATED:   November 15, 2024

                        */s/ Scott D. Tenley* _____
                        SCOTT D. TENLEY

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FAC

# **E-FILING ATTESTATION OF SIGNATURE**

I, Scott D. Tenley, am the ECF user whose ID and password are being used to file this document.  In compliance with Civil Local Rule 5-4.3.4(a)(2)(i), I hereby attest that the signatory above has concurred in and authorized this filing.

DATED: November 15, 2024

/s/ *Scott D. Tenley*
SCOTT D. TENLEY

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FAC

## **CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the above and foregoing document was served on all counsel of record via this Court's CM/ECF system on November 15, 2024.

DATED: November 15, 2024

*/s/ Scott D. Tenley*
SCOTT D. TENLEY

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO DISMISS THE FAC